<u>NOT FOR PUBLICATION</u>

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| **INTERLINK GROUP CORPORATION USA, INC.,** | **Civil Action No. 12-6179 (JBC)** |
| **Plaintiff,** | |
| v. | |
| | **OPINION** |
| **AMERICAN TRADE AND FINANCIAL CORP., et al.** | |
| **Defendants/ Third Party Plaintiff** | |
| v. | |
| **ALEXANDER KARPMAN,** | |
| **Third Party Defendant.** | |

This matter comes before the Court upon a Motion for Summary Judgment [Docket Entry

No. 54] by Defendants American Trade and Financial Corporation ("ATFC") and Anatoli

Timokhine ("Timokhine"), and a Motion for Partial Summary Judgment [Docket Entry No. 57]

by Plaintiff Interlink Group Corp. USA, Inc. ("Interlink"). The Court has reviewed the

submissions of the parties and considered the motions without oral argument pursuant to Federal

Rule of Civil Procedure 78.

I. BACKGROUND[1]

The parties were in business together selling chicken eggs overseas from 2005 to 2012.

(DS ¶ 13; PR ¶ 13). In 2010, Plaintiff Interlink brought a claim for breach of contract against a

---

[1] The facts below are taken from the parties' statements of undisputed facts. "DS" refers to the Defendants' Statement of Facts, "PR" refers to the Plaintiff's Response to Defendants' Statement of Facts, "PS" refers to the Plaintiff's Statement of Facts, "DR" refers to Defendants' Response to Plaintiff's Statement of Facts.

third-party egg supplier in Florida. DS ¶ 17; PR ¶ 17. After the parties stopped doing business together, the jury in the Florida case returned a multi-million dollar damages award against the third-party egg supplier. DS ¶ 27; PR ¶ 27. Plaintiff and Defendants, now former business partners, disagreed about how to divide the damages award. DS ¶ 34; PR ¶ 34.

Several months after the jury verdict, Plaintiff Interlink had not paid Defendant Timokhine any of the damages award. *See* DS ¶ 31; PR ¶ 31. Interlink agreed to pay Timokhine $780,504.76 if he signed a non-compete agreement stating that he would not solicit Interlink clients or suppliers for five years. DS ¶¶ 33-34; PR ¶¶ 33-34. Timokhine signed the non-compete agreement on or about August 3, 2012, and Interlink paid him. DS ¶¶ 34 & 38; PR ¶¶ 34 & 38. It is undisputed that, after signing the non-compete agreement, Timokhine continued to contact a former Interlink client to conduct business. PS ¶ 7; DR ¶ 7. This dispute principally arises out of Defendant Timokhine's alleged breach of the non-compete agreement and his purported entitlement to a portion of the jury verdict in the Florida case. *See* Complaint, Docket Entry No. 1; Amended Counterclaim, Docket Entry No. 49. Defendants argue that the non-compete agreement is invalid for lack of consideration because Plaintiff was under a preexisting legal duty to pay them half of the damages award. *See* Am. Countercl. Plaintiff argues that Timokhine was never entitled to any of the jury verdict proceeds and only paid Timokhine as consideration for his agreeing not to compete with Interlink. *See* Compl.

a. The Parties' Business Relationship

Plaintiff Interlink was formed by Alexander Karpman in 1998. DS ¶ 10; PR ¶ 10.  It ships broiler hatching chicken eggs – eggs from which chickens are raised for meat production – from

U.S. suppliers to a number of overseas purchasers in the Commonwealth of Independent States.[2]
DS ¶ 11; PR ¶ 11. In 2004 Karpman contacted one of his relatives, Defendant Timokhine, about
doing business in the United States. DS ¶ 9; PR ¶ 9.

Timokhine had learned English in Russia, and he left Russia in 1991 for the United
States, where he was hired by a finance company. DS ¶¶ 4-5; PR ¶¶ 4-5. In 1999, he formed
ATFC. DS ¶¶ 6 & 8; PR ¶¶ 6 & 8. By 2005, Interlink and ATFC had entered into an oral
agreement to ship chicken eggs. DS ¶ 11; PR ¶ 11. The particular contours of their
responsibilities and scope of the relationship are disputed. (DS ¶¶ 15-16; PR ¶¶ 15-16).  At the
very least, it is undisputed that ATFC and Timokhine were responsible for the drafting and/or
maintenance of various documents relating to the business, logistics, and finances.  DS ¶ 16; PR
¶ 16. Timokhine operated under the title of Chief Financial Officer, although the parties dispute
the extent of his tenure in that position.  DS ¶ 19; PR ¶ 19.  From 2005 to 2012, the parties
conducted business and shared profits without a written agreement. DS ¶ 12; PR ¶ 12.

b. Florida Litigation

In 2007, Defendant Timokhine drafted an exclusivity agreement between Interlink and a
U.S. broiler hatching egg supplier called Morris Hatchery, Inc. *See* Morris Hatchery Exclusivity
Agreement, Ex. G to Hoffman Certification in Support of Defendants' Motion for Summary
Judgment, Docket Entry No. 54-18; DS ¶ 17; PR ¶ 17. Interlink eventually sued Morris Hatchery
in the Southern District of Florida for breaching the exclusivity agreement.  DS ¶ 17; PR ¶ 17.
Although the District Judge declared a portion of the exclusivity agreement invalid for lack of
essential terms, a portion of the contract was declared valid and enforceable. DS ¶ 46; PR ¶ 46.

---

[2] According to the parties, the countries include Ukraine, Kazakhstan, Byelorussia,
Uzbekistan, Azerbaidzhan, Georgia, Armenia, Turkmenia, Moldavia, Tadzhikistan, and Kirgizia.

During the litigation, the business relationship between Interlink and Defendants deteriorated. DS ¶ 23; PR ¶ 23.The parties dispute the reason for this deterioration: Plaintiff claims that Timokhine's poor performance drafting exclusivity agreements was the cause, whereas Timokhine contends that he terminated the relationship because Interlink stopped sharing its profits equally. *Id.* It is undisputed that the parties ceased conducting business on March 31, 2012.  DS ¶ 24; PR ¶ 24.

After trial in the Florida case, the jury found that the third-party egg supplier Morris Hatchery had breached the contract. DS ¶ 47; PR ¶ 47. As a result, on May 4, 2012, Interlink was awarded $2,089,797.92 in damages. DS ¶ 27; PR ¶ 27. Although both parties agree that they originally split the profits of their business, Plaintiff claims that this agreement changed in the Spring of 2011.  The parties dispute whether any damages award in the Florida litigation was subject to profit-sharing and whether they split the costs of the attorneys' fees. DS ¶ 20; PR ¶ 20.

c. Non-compete Agreement

After the parties had ended their business relationship, Defendant Timokhine contacted an Interlink client, Keith Smith Co. PS ¶ 7; DR ¶ 7. In June 2012, he discussed setting up an agreement with Keith Smith to sell broiler hatching eggs to a company called White Bird. Compl. ¶ 3.

A couple of months later, Timokhine had not received any share of the damages award. DS ¶¶ 30-31; PR ¶¶ 30-31. Instead, Plaintiff Interlink informed him that it would not pay any portion of the damages award unless Timokhine agreed to stop conducting all activity in the egg business. *Id.* On August 3, 2012, Timokhine entered into "Agent Non-Competition, Non-Disclosure and Non-Solicitation Agreement" with Interlink. DS ¶ 38; PR ¶ 38; PS ¶ 8; DR ¶ 8. According to the agreement, Defendants received $780,504.75 as consideration. *See* Non-

Competition Agreement, Ex. A to Plaintiff's Partial Motion for Summary Judgment, Docket

Entry No. 57-2, at 3. In relevant part, the non-complete agreement states:

> 2.1 AGENT agrees that during the period of FIVE YEARS (5 years) commencing with the signing of this agreement he will not, without the COMPANY's prior express written consent, engage in any (part-time or full-time) employment, consulting or other business which is directly or indirectly connected with (other than by virtue of ownership of less than 2% of the outstanding capital stock of any class of publicly-traded company) any business that is a client of the COMPANY and for which the AGENT performed, bought or sold services on the COMPANY's behalf or which is in competition with the COMPANY.
>
>                * * *
>
> 3.1 AGENT agrees that AGENT will not, during the FIVE YEARS (5 years) commencing with the signing of this agreement, solicit, service, do business with or sell to any customer or client of the COMPANY that purchased any product or service from the COMPANY for which AGENT performed or sold services on the COMPANY's behalf.

Defendant Timokhine continued a discussion with Keith Smith Co. after signing the non-

compete agreement, but the proposed contract was cancelled.  DS ¶ 42; PR ¶ 42. On September

21, 2012, counsel for Defendants wrote Interlink a letter stating that the non-compete agreement

was "fraudulently procured and is substantially unconscionable and unenforceable, and is void

ab initio." PS ¶ 12; DR ¶ 12. In response, Interlink filed the Complaint in this Court on October

2, 2012, alleging four causes of action, including, *inter alia*, breach of contract, breach of

fiduciary duties, and tortious interference with business relations. *See* Compl. Defendants have

filed counterclaims alleging breach of contract, unjust enrichment, promissory estoppel, and

tortious interference with business relations. *See* Am. Countercl. Defendants also seek a

declaratory judgment that the non-compete agreement is unenforceable. *Id.*

d. Procedural History

In the Complaint, Interlink asserts four counts: Count I - Breach of Contract; Count II - Declaratory Judgment and Injunctive Relief; Count III - Breach of Fiduciary Duty; and Count IV - Tortious Interference with Business Relations. Plaintiff moved for a preliminary injunction on Count II, *see* Docket Entry No. 3, and Defendants moved to dismiss the Complaint, *see* Docket Entry No. 19. Defendants also filed a third party complaint against Plaintiff Interlink and Alexander Karpman, the owner of Interlink, for, among other things, breach of contract.  See Third Party Complaint, Docket Entry No. 32.

On April 25, 2013, this Court denied both the motion for a preliminary injunction and the motion to dismiss, but declined to exercise jurisdiction over Plaintiff's declaratory judgment claim, Count II. Docket Entry No. 33.  Additionally, Plaintiff has voluntarily abandoned its tortious interference claim, Count IV. *See* Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment ("Pl.'s Br."), 1 n.1, Docket Enty No. 66 ("At this time, based on the evidence developed during discovery, Interlink is no longer pursuing its Tortious Interference claim against the Defendants (Count IV)."). On November 22, 2013, Defendants moved for summary judgment on the two remaining claims of the Complaint: breach of contract (Count I) and breach of fiduciary duty (Count III), or if the Court found the non-compete agreement valid, Defendants moved for summary judgment on its breach of contract and promissory estoppel counterclaims, in the alternative. *See* Defendants' Br. in Support of Motion for Summary Judgment ("Defs.' Br."), Docket Entry No. 54.  Plaintiff moved for partial summary judgment, seeking entry of summary judgment on Plaintiff's breach of contract claim only (Count I). *See* Plaintiff's Brief in Support of Partial Summary Judgment Motion, Docket Entry No. 57.

## II.  STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56(c), a motion for summary judgment will

be granted if the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any material fact and

that the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477

U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In other words, "[s]ummary judgment

may be granted only if there exists no genuine issue of material fact that would permit a

reasonable jury to find for the nonmoving party." *Miller v. Indiana Hosp.*, 843 F.2d 139, 143 (3d

Cir.1988). All facts and inferences must be construed in the light most favorable to the non-

moving party. *Peters v. Delaware River Port Auth.*, 16 F.3d 1346, 1349 (3d Cir.1994). The

judge's function is not to weigh the evidence and determine the truth of the matter, but to

determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249.

"Consequently, the court must ask whether, on the summary judgment record, reasonable jurors

could find facts that demonstrated, by a preponderance of the evidence, that the nonmoving party

is entitled to a verdict." *In re Paoli R.R. Yard PCB Litigation*, 916 F.2d 829, 860 (3d Cir.1990).

The party seeking summary judgment always bears the initial burden of production.

*Celotex Corp.*, 477 U.S. at 323. This burden requires the moving party to establish either that

there is no genuine issue of material fact and that the moving party must prevail as a matter of

law, or to demonstrate that the nonmoving party has not shown the requisite facts relating to an

essential element of an issue on which it bears the burden. *Id.* at 322–23. Once the party seeking

summary judgment has carried this initial burden, the burden shifts to the nonmoving party.

To avoid summary judgment, the nonmoving party must then demonstrate facts

supporting each element for which it bears the burden, and it must establish the existence of a

"genuine issue of material fact" justifying trial. *Miller*, 843 F.2d at 143; *accord Celotex Corp.*,

477 U.S. at 324. The nonmoving party "must do more than simply show that there is some

metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475

U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "Where the record taken as a whole could

not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for

trial.' " *Id.* at 587 (quoting *First National Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289,

88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)). Further, summary judgment may be granted if the

nonmoving party's "evidence is merely colorable or is not significantly probative." *Anderson*,

477 U.S. at 249–50.

### III.  DISCUSSION

(a) Breach of Contract

In his motion, Defendant Timokhine argues that the Court should grant summary

judgment on Count I of the Complaint, alleging breach of the non-compete agreement, because:

(1) the non-compete agreement purportedly lacked consideration and is not a valid contract; (2)

Plaintiff has not established any actual damages suffered as a result of Defendants' alleged

breach of the non-compete agreement; and (3) the non-compete agreement is unenforceable as

against public policy. *See* Defs.' Br. 18-28.

(1) Alleged Absence of Consideration

"To prevail on a breach of contract claim under New Jersey law, a plaintiff must establish

three elements: (1) the existence of a valid contract between the parties; (2) failure of the

defendant to perform its obligations under the contract; and (3) a causal relationship between the

breach and the plaintiff's alleged damages." *Sheet Metal Workers Int'l Ass'n Local Union No. 27,*

*AFL-CIO v. E.P. Donnelly, Inc.*, 10-2201, 2013 WL 6510921 (3d Cir. Dec. 13, 2013) (citing

*Coyle v. Englander's,* 199 N.J.Super. 212, 488 A.2d 1083, 1088 (N.J. Super. Ct. App. Div.

1985)).  To prove the existence of a valid contract between the parties, the plaintiff must show:

"mutual assent, consideration, legality of object, capacity of the parties and formality of

memorialization."  *Cohn v. Fisher,* 118 N.J. Super. 286, 291, 287 A.2d 222, 224 (N.J. App. Div.

1972).

The validity of a contract, including a non-compete agreement, "rests in part upon the

existence of good and sufficient consideration." *Hogan v. Bergen Brunswig Corp.*, 153 N.J.

Super. 37, 42, 378 A.2d 1164, 1167 (App. Div. 1977) (citing *A. Hollander & Son v. Imperial Fur

Blending Corp.*, 2 N.J. 235, 249 (1949)).  An agreement fails for lack of consideration, however,

where the purported consideration for the agreement arises out of a preexisting legal duty.

*Hyman v. WM Fin. Servs., Inc.*, Civ. No. 07-3497, 2008 WL 1924879 (D.N.J. Apr. 29, 2008);

*Berel Co. v. Sencit F/G McKinley Assocs.,* 710 F.Supp. 530, 536 (D.N.J. 1989) (citing

Restatement (Second) of Contracts § 73 & Cmt. (1981)); *Gray v. Martino,* 103 A. 24, 24 (N.J.

1918).  Thus, where a defendant's alleged obligation to pay plaintiff under a contract is already

required by an earlier duty, there is insufficient consideration for the contract. *Shakib v. Back

Bay Rest. Grp., Inc.*, Civ. No. 10-4564, 2011 WL 4594654 (D.N.J. Sept. 30, 2011); *U.S. Land

Res., LP v. JDI Realty LLC*, Civ. No. 08-5162, 2009 WL 2488316 (D.N.J. Aug. 12, 2009); *Merlo

v. Fed. Exp. Corp.*, Civ. No. 07-4311, 2010 WL 2326577 (D.N.J. June 7, 2010).

Here, Interlink asserts that it paid Defendant Timokhine approximately $780,000 to sign

the non-compete agreement, and that payment was valid consideration.  Defendants respond that

Plaintiff was under a preexisting duty to pay that amount of money based on an oral profit-

sharing contract and an agreement to equally split the proceeds of the damages award.  Thus,

whether there was valid consideration for the 2012 non-compete contract depends on the existence of a profit sharing agreement.  In other words, if the 2005 oral agreement was valid, then Interlink was under a preexisting legal duty to pay part of the damages award and the 2012 non-compete fails for lack of consideration.  If, on the other hand, the 2005 oral agreement was invalid, modified, or abrogated, such that there was no agreement to share the profits of any damages award, then Interlink's payment to Timokhine constitutes consideration and the 2012 non-compete does not fail for lack of consideration.

Defendants request that the Court grant summary judgment on this issue, pointing to evidence of a profit-sharing agreement.  He asks: "[w]hy would Mr. Timokhine pay half of Interlink's attorney's fees and costs in the Florida lawsuit . . . [w]hy would Mr. Timokhine confirm in emails an agreement that he would receive half of the verdict proceeds . . . ." Defs.' Br. 22.  Plaintiff argues that the evidence that Defendants point to – Karpman's notes on attorneys' fees handwritten on scraps of paper – were drafts of an agreement that never came into force.  Pl.'s Br. 15.  Plaintiff offers evidence, pointing to deposition testimony where Karpman denied that there was an agreement to split the profits from any damage award in the Florida lawsuit: "I didn't have any agreement. Payment for legal services was completely made by Interlink." Ex. C to Pl.'s Br. at 152:21-153:8, Docket Entry No. 66-7. Thus, each party offers evidence regarding the existence of an agreement to share profits.  The question, however, of whether parties formed an agreement is an issue of fact.  *Krichman v. Van Velsor Co*., 127 N.J.L. 533, 534 (1942); *Philips Bros. Elec. Contractors, Inc. v. Great Am. Ins. Co*., 133 F. App'x 815, 816 (3d Cir. 2005) ("In the case of a disputed oral contract, what was said and done by the parties, as well as what was intended by what was said and done by the parties, are questions of fact to be resolved by the trier of fact.") (internal alterations omitted) (applying Pennsylvania

law). The parties do not dispute the existence of an agreement to share profits, but do dispute whether that agreement was terminated or modified and whether the purported profit-sharing agreement encompassed a damages award. See DS ¶¶ 14 & 20; PR ¶¶ 14 & 20. Consequently, whether Interlink's $780,504 payment to Timokhine was due under the 2005 profit-sharing agreement or was consideration for the 2012 non-compete agreement is a dispute of fact.

Defendants also moved for judgment as a matter of law on their counterclaims that Plaintiff Interlink breached the 2005 contract to share profits by failing to share the damages award. They argue that "if there is a finding that as a matter of law the [non-compete agreement] was supported by adequate consideration, then [Plaintiff] failed to pay . . . the equal share of the judgment proceeds of the Florida Lawsuit." *See* Defs.' Br. 2-3. As they state, however, "the $780,504.75 paid by Interlink to ATFC was either consideration for the RCA or ATFC's one-half share of the proceeds of the Florida Lawsuit. It could not be both." Defs.' Br. 3. Again, the contours of the 2005 profit-sharing agreement are disputed. That disputed question of fact underlies Defendant's counterclaim. Consequently, judgment as a matter of law is denied as to that claim.

(2) Alleged Lack of Damages

Defendants next claim that Plaintiff has come forward with no evidence "showing that Interlink suffered any damages from any alleged breach." Defs.' Br. 27. They assert that Defendants contact with former clients has not caused Interlink to lose any business and that Defendants have not profited from this contact.

The New Jersey Supreme Court has held that proof of actual damages is not necessary to survive summary judgment on a breach of contract claim: "the general rule is that whenever there is a breach of contract, or an invasion of a legal right, the law ordinarily infers that damage

11

ensued, and, in the absence of actual damages, the law vindicates the right by awarding nominal

damages." *Nappe v. Anschelewitz, Barr, Ansell & Bonello*, 97 N.J. 37, 45-46 (1984) (internal

citations omitted) (citing *Spiegel v. Evergreen Cemetery Co.*, 117 N.J.L. 90, 96-97 (1936) ("It is

the established rule in this state that whereever there is a breach of contract, or the invasion of a

legal right, the law ordinarily infers that damage has ensued. And, in the absence of actual loss,

the law vindicates the right by awarding nominal damages. The injury imports damage.")). The

New Jersey Supreme Court has distinguished a claim for breach of contract – a cause of action

that does not require proof of actual damages – from the tort of negligence, which requires

showing both "a breach of duty and resulting damage to prevail." *Nappe*, 97 N.J. at 45-46.  The

Supreme Court's reasoning follows the Second Restatement of Contracts, which states, "[i]f the

breach caused no loss or if the amount of the loss is not proved under the rules stated in this

Chapter, a small sum fixed without regard to the amount of loss will be awarded as nominal

damages." Restatement (Second) of Contracts § 346 (1981).  The comment clarifies that,

"[a]lthough a breach of contract by a party against whom it is enforceable always gives rise to a

claim for damages, there are instances in which the breach causes no loss. . . In all these

instances the injured party will nevertheless get judgment for nominal damages . . . ." *Id.*

Similarly, the Third Circuit, following the New Jersey Supreme Court and the Second

Restatement, has found that in "a breach of contract [claim] the injured party is entitled to

nominal damages even when its proof fails to show substantial loss."  *Norwood Lumber Corp. v.*

*McKean*, 153 F.2d 753, 755 (3d Cir. 1946) (citing Restatement (Second) of Contracts § 346;

*Coca-Cola Bottling Co. of Elizabethtown, Inc. v. Coca-Cola Co.*, 988 F.2d 386, 409 (3d Cir.

1993). Applying New Jersey law, courts in this district have allowed breach of contract claims to

proceed despite proof of actual damages. *Zacks v. NetJets Inc.*, Civ. No. 11-2537, 2011 WL

4387147 (D.N.J. Sept. 20, 2011) ("Although it appears that Plaintiff has not suffered any actual

damages as a result of the salary reduction, this is not fatal to his claim"); *Allia v. Target Corp.*,

Civ. No. 07-4130, 2010 WL 1050043 (D.N.J. Mar. 17, 2010) ("Target need only prove a breach

of the contract, and not actual damages."); *Joseph Oat Holdings, Inc. v. RCM Digesters, Inc.*,

Civ. No. 06-4449,  2009 WL 4895262 (D.N.J. Dec. 11, 2009) ("For defendants' breach of the

confidentiality agreement claim, defendants need only prove a breach of the contract, and no

actual damages."); *see also City of Trenton v. Cannon Cochran Mgmt. Servs., Inc.*, Civ. No. A-

5576-09T1, 2011 WL 3241579 (N.J. Super. Ct. App. Div. Aug. 1, 2011) ("[L]iability for breach

of contract does not require proof of damage beyond the breach itself."); *Gray v. Serruto

Builders, Inc.,* 110 N.J. Super. 297, 315 (Ch. Div. 1970) ("While actual damages will be awarded

when they can be proved, nominal damages will be presumed from the encroachment of an

established right.").  Defendants have cited several non-binding cases with contrary holdings.

Because none of these cases distinguish the New Jersey Supreme Court's holding that actual

damages need not be proved in a breach of contract case to survive summary judgment, the

Court does not find Defendants' argument persuasive.[3]

(3) Public Policy

Defendants assert that the non-compete agreement is overbroad and void as against

public policy because it prohibits Timokhine "from working in any competing industry,

---

[3] The cases Defendants has referenced cite *Cumberland County Improvement Authority v. GSP Recycling Co., Inc.*, 358 N.J. Super. 484, 503 (N.J. Super. Ct. App. Div.), *cert. denied*, 177 N.J. 222 (2003), for the proposition that a plaintiff must prove actual damages in a breach of contract claim. The *Cumberland* Court, however, found that damages had not been adequately proved under the non-delivery damages provision of the Uniform Commercial Code.  Absent proof of "the difference between the market price at the time when the buyer learned of the breach and the contract price," the Court affirmed the judgment dismissing the claim. *Id.* It did not find that general contract claims require proof of actual damages.

anywhere in the world, or from having any business relationship with any Interlink customer, supplier or even vendor, for a period of five years." Defs.' Br. 26.

Restrictive covenants in employment contracts are enforceable under New Jersey law if they (1) protect a legitimate interest of the employer; (2) impose no undue hardship on the employee; and (3) are not injurious to the public. *See Solari Indus., Inc. v. Malady*, 264 A.2d 53, 56 (1970). However, where a non-compete agreement seeks to impose overbroad restrictions, courts may disregard the covenant or give it complete or partial enforcement to the extent reasonable. *See Cost Reduction Solutions v. Durkin Group, LLC*, Civ No. A-0046-07T2, 2008 WL 3905679, at *3 (N.J. Super. Ct. App. Div. Aug. 22, 2008)(citing *Hosp. Group, Inc. v. More*, 183 N.J. 36, 57 (2005)). In determining the reasonableness of an agreements limitations, courts consider three additional factors of the non-compete agreement's "duration, the geographic limits, and the scope of activities prohibited." *Hosp. Group*, 183 N.J. at 57.

As stated above, there exists a genuine issue of material fact as to consideration paid and thus validity of the non-compete agreement. The Court further notes that while Plaintiff addresses the potential for merely narrowing the agreement instead of deeming it void in whole, neither Defendants nor Plaintiff fully address the contours of this possibility. Thus, the Court reserves judgment on this issue. If the agreement is determined valid, then the Court will address the extent of its provisions at that time. If the agreement is found to be invalid, the issue is moot.

(b) Breach of Fiduciary Duty

"In order to establish a cause of action for a breach of fiduciary duty in New Jersey, a plaintiff must show that the defendant had a duty to the plaintiff, that the duty was breached, that injury to plaintiff occurred as a result of the breach, and that the defendant caused that injury." *Goodman v. Goldman, Sachs & Co.*, Civ. No. 10–1247 FLW, 2010 WL 5186180, *10 (D.N.J.

14

Dec. 14, 2010) (citing *St. Matthew's Baptist Church v. Wachovia Bank Nat. Ass'n*, No. Civ. A. 04–4540, 2005 WL 1199045, \*9 (D.N.J. May 18, 2005); *see also In re ORFA Sec. Litig.*, 654 F. Supp. 1449, 1457 (D.N.J. 1987) ("[T]o prove a breach of fiduciary duty, [plaintiff] must show 'a duty, a breach, an injury, and causation.'").

Under New Jersey law, a fiduciary relationship exists when one party is "under a duty to act for or give advice for the benefit of another on matters within the scope of their relationship." *F.G. v. MacDonell*, 150 N.J. 550, 696 A.2d 697, 704 (1997)(citing Restatement (Second) of Torts, § 874 (1979)); *Trianco, LLC v. IBM*, 271 F. App'x 198, 203 (3d Cir. 2008) (finding that a duty arises out of a "special relationship of trust and confidence" between the parties).

"[A]n agent has a duty to the principal to act with the care, competence, and diligence normally exercised by agents in similar circumstances." Restatement (Third) of Agency § 8.08 (2006); *see also Big M, Inc. v. Dryden Advisory Group*, Civ. No. 08-3567 KSH, 2009 WL 1905106, at \*24 (D.N.J. June 30, 2009)("All fiduciaries are 'held to a duty of fairness, good faith, and fidelity.'")(quoting *Estate of Spencer v. Gavin*, 400 N.J. 74, 78 (N.J. Super. Ct. App. Div. 2008)). Generally, a fiduciary owes "a duty to exercise reasonable skill and care." *See McKelvy v. Pierce*, 173 N.J. 26, 57 (2002). The level of care and competence, however, may be altered by contract, law, or regulation. *See* Restatement (Third) of Agency § 8.08. cmt. a (2006). For example, under the Revised Uniform Partnership Act, a partner owes a duty of care limited to "refraining from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law." *See* Rev. Unif. Partnership Act § 404(c). In an employer/employee relationship, "[a]bsent a special agreement, an employee whose best efforts resulted in poor performance, causing a loss of profits, does not become liable for such losses in a breach of contract action….The employer's remedy is to fire the employee for ineptness or lack of

diligence." *Fried v. Aftec, Inc.*, 246 N.J. Super. 245, 258 (N.J. Super. Ct. App. Div. 1991).

Here, the parties have created a genuine issue of material fact because they dispute the nature, scope, and even duties performed in support of their working relationship. Defendants move for summary judgment under two different standards: that of joint venturers, falling under New Jersey's Rev. Unif. Partnership Act, N.J.S.A. 42:1A-24, or that of employer/employee. *See* Defs.' Br. 29-37. Plaintiff claims that ATFC was hired as an independent contractor. *See* Pl.'s Br. 32. Where parties dispute the type of business relationship they have, courts turn to the facts of the relationship. *See U.S. ex rel. PCC Const., Inc. v. Star Ins. Co.*, 90 F.Supp.2d 512, 519 (D.N.J. 2000)(considering such facts as mutuality of control, profit and loss sharing, and actual conduct of parties to determine existence of joint venture between parties). Here, as the parties operated with no written agreement until after their collaboration had ended, and the parties actively dispute the various terms, duties, and responsibilities under their business venture, *see* DS ¶¶ 15-16; PR ¶¶ 15-16, the nature and conduct of their business is an open question of fact. Consequently, because the type of relationship is a fact question, the Court cannot undertake an analysis of which duties may apply to the case at hand.  As such, summary judgment cannot be granted.

Moreover, even if the parties had agreed on a basic type of employment, in most circumstances the reasonableness of Defendants' conduct is also a question of fact for the fact finder. *Jerkins v. Anderson*, 191 N.J. 285, 305 (2007) ("[W]hether the duty was breached is a question of fact."); *see also Violette v. Ajilon Finance*, Civ. No. 03-5520 JLL, 2005 WL 2416986, at *8 (D.N.J. Sept. 30, 2005)("[Q]uestions of reasonableness of conduct and good faith are ordinarily for the judgment of the triers of the facts, … such are questions of law for the court when the facts are undisputed and not fairly susceptible of divergent inferences.")(quoting *Broad*

*& Branford Place Corp. v. J.J. Hockenjos Co.* 132 N.J.L. 229, 233 (1944)).  As the parties

dispute the nature of their relationship, the duties which Defendants were contracted to perform,

and the manner in which those duties were performed, the Court finds that a genuine issue of

material fact exists and the entry of summary judgment is not warranted.

The Court notes that Plaintiff raises for the first time in its opposition to the motion the

theory that Defendants breached a duty of loyalty by contacting Keith Smith to arrange for the

sale of eggs in CIS countries. *See* Pl.'s Opp. 26-27. Count III in Plaintiff's Complaint however is

predicated exclusively on Defendants' drafting of the exclusivity agreement. *See* Compl. ¶¶ 71-

85. "Federal pleading standards do not allow a party 'to raise new claims at the summary

judgment stage…Liberal pleading does not require that, at the summary judgment stage,

defendants must infer all possible claims that could arise out of the facts set forth in the

complaint."  *Dewees v. Haste*, 620 F.Supp. 2d 625, 635 n.7 (M.D. Pa. 2009)(quoting *Gilmore v.*

*Gates, McDonald & Co.,* 382 F.3d 1312, 1314-15 (11th Cir. 2004)). Additionally, district courts

have broad authority to "disallow the addition of new theories of liability at the eleventh hour."

*See Carr v. Gillis Associated Industries, Inc.*, 227 Fed. App'x 172 (3d Cir. 2007); *see also Com.*

*of Pa. ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 ("the legal theories set forth in

[the] briefs are helpful only to the extent that they find support in the allegations set forth in the

complaint."); *Bell v. City of Philadelphia*, 275 Fed. App'x 157, 160 (3d Cir. 2008)(finding that

the plaintiff improperly raised a new component of a First Amendment claim in his response to a

summary judgment motion). The Court finds Plaintiff's attempt to assert allegations of a breach

of the duty of loyalty based on communication with Keith Smith in 2012 is an impermissible

attempt to amend via briefs on a motion for summary judgment. Accordingly, Plaintiff's claims

of breach of loyalty/fiduciary duty will be limited at trial to those expressly set forth in Count III

17

of the Complaint.

IV. CONCLUSION

For the reasons stated above, the Court finds that there exists a genuine issue of material facts as to the nature and purpose of the $780,504 paid to Timokhine.  As such, a genuine issue of material fact exists as to whether there was consideration for the non-compete agreement signed and as to whether Defendants were paid what they are entitled to under their business agreement.  The Court therefore denies Defendants' motion for summary judgment as to Count I and Counterclaims VII and VIII and Plaintiff's partial motion for summary judgment on Count I. Likewise, the Court finds there is a genuine issue of material fact as to the nature of the parties' relationship and if and what fiduciary duty may exist.  Therefore, the Court will deny Defendants' motion for summary judgment as to Count III. An appropriate Order shall follow.


Dated: July 18, 2014


                                            ___s/James B. Clark, III___
                                            HON. JAMES B. CLARK III
                                            United States Magistrate Judge