**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

**INTERLINK GROUP CORP. USA, INC.,**

        **Plaintiff,**

    v.

**AMERICAN TRADE AND FINANCIAL CORP., et al.,**

        **Defendants/**
        **Third-Party Plaintiffs,**

    v.

**ALEXANDER KARPMAN,**

        **Third-Party Defendant.**

**Civil Action No. 12-6179 (JBC)**

**FINDINGS OF FACT**
**AND**
**CONCLUSIONS OF LAW**

---

**CLARK, United States Magistrate Judge**

## I.    INTRODUCTION

Plaintiff Interlink Corporation ("Plaintiff" or "Interlink"), a privately-held New Jersey Corporation, brought this action against Defendants, American Trade and Financial Corporation ("ATFC"), a Connecticut corporation, and Anatoli Timokhine ("Timokhine"), ATFC's President (collectively "Defendants"), seeking damages for breach of contract (Count I) and breach of fiduciary duties (Count III).[1] *See* Compl., Dkt. No. 1. Defendants filed counterclaims against

---

[1] The Complaint originally stated Four Counts: Breach of Contract (Count I); Injunctive Relief (Count II); Breach of Fiduciary Duties (Count III); and Tortious Interference with Business Relations and Contracts (Count IV). The Honorable Faith S. Hochberg, U.S.D.J., denied Plaintiff's request for injunctive relief. *See* Order and Opinion, Dkt. No. 33. Further, in its Opposition to Defendants' Motion for Summary Judgment, Interlink withdrew its claim for

Interlink for breach of contract (Counts I, II, VII), unjust enrichment (Count III), promissory estoppel (Counts IV, VIII), declaratory judgment (Count V), and tortious interference with contractual relations (Count VI).  *See* Am. Countercl., Dkt. No. 49.  Defendants also filed a Third Party Complaint against Alexander Karpman ("Karpman"), president of Interlink, seeking damages for breach of fiduciary duty (Count I), fraudulent misrepresentation (Count II), and tortious interference with contractual relations (Count III).  *See* Third Party Compl., Dkt. No. 32.

This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(2) as diversity of citizenship exists between the parties and the amount in controversy exceeds $75,000.  *See* Final Pretrial Order ("FPO"), dated March 11, 2014, §1, Dkt. No. 80.

The parties consented to jurisdiction of the Undersigned, United States Magistrate Judge James B. Clark, III, to resolve the case.  *See* 28 U.S.C. § 636(c); Dkt. No. 82.  A three-day bench trial was conducted by the Undersigned on August 4, 2014 through August 6, 2014.  The parties presented testimony and exhibits, examined and cross-examined three witnesses, and argued their respective cases.[2]  One witness, Dr. Jerald Udinsky ("Udinsky"), Plaintiff's expert witness on damages, was not available to be deposed by Defendants before the trial or appear at the trial.  The parties provided the Court the transcripts of Udinsky's examination and cross-examination for consideration.  Based upon the trial record and stipulations of the parties in the Final Pretrial Order,

---

Tortious Interference with Business Relations and Contracts (Count IV).  *See* Statement of Material Facts in Opposition, Brief in Opposition, at 1, n.1, Dkt. No. 66-2.

[2] The Court heard testimony from the following individuals:
1. Anatoli Timokhine, Defendant, individual and as president of ATFC;
2. Eddy Slick, Director of Sales for Keith Smith Corporation, a company that contracted with both Interlink and ATFC at various points; and
3. Alexander Karpman, Third Party Defendant, individual and as president of Interlink.

the Court makes the following findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52.

## II.    <u>FINDINGS OF FACT[3]</u>

### A. *Background*

1.      The underlying litigation stems from a business venture undertaken by Interlink, through its president, Karpman, and ATFC, through its president, Timokhine.  *See* Dkt. No. 80, FPO, "Stipulation of Facts" ("SOF"), §3, No. 11; Timokhine Test.; Karpman Test.

2.      Prior to his emigration to the United States in 1995, Karpman went to school and worked in Russia.  Karpman Test.

3.      Karpman testified that while working in a remote section of Russia, he developed the process and business of shipping live food products into the region.  Karpman Test.

4.      In 1998, Karpman formed Interlink, a privately-held New Jersey corporation, to export various goods, including equipment and food products to Russia and former Soviet Union countries ("CIS countries").[4]  SOF §3, No. 1; Karpman Test.  Interlink's personnel is limited, consisting solely of Karpman as president, and other officers of the company.  Interlink has at least

---

[3] Since the parties have the transcripts of the proceedings, the Court will refer only generally to the testimony of various parties where the facts appear not in dispute.  The Court will identify page and/or line numbers where necessary.  The testimony of Alexander Karpman is referenced as "Karpman Test."  The testimony of Anatoli Timokhine is referenced as "Timokhine Test."  The testimony of Eddy Slick, representative of Keith Smith, Inc., is referenced as "Slick Test."  There are three transcripts from the trial:  (1) Volume I, dated August 4, 2014, Dkt. No. 117 ("Vol. I"); (2) Volume II, dated August 5, 2014, Dkt. No. 118 ("Vol. II"); and (3) Volume III, dated August 6, 2014, Dkt. No. 119 ("Vol. III").  Any specific references to testimony in the transcript will be designated as follows: "Timokhine Test, Vol. I, Page number:Line number".

[4] According to the parties, these countries include Ukraine, Kazakhstan, Byelorussia, Uzbekistan, Azerbaidzhan, Georgia, Armenia, Turkmenia, Moldavia, Tadzhikistan, and Kirgizia.  *See* Opinion on Summary Judgment Motions, at 3, n.2, Dkt. No. 100.

one other member working for it in Russia who engages with Russian businesses.  Karpman Test.
Karpman testified that in the past he had retained lawyers to work for Interlink.  Karpman Test.

5.      In 2003, Karpman became an American citizen.  Karpman Test.

6.      Defendant Timokhine was also educated in Russia and worked there for a time.
Timokhine Test.  Timokhine graduated from the Moscow Finance Institute in 1974 with a degree
in international finance and business.  SOF §3, No. 5; Timokhine Test.  He worked with several
international banks and financial institutions where he gained experience in the field of
international trade and project finance.  SOF §3, No. 6; Timokhine Test.  Timokhine testified that
his background was in international finance, and that he did not have any legal training.  SOF §3,
No. 8; Timokhine Test.

7.      In 1991, Timokhine came to the United States, where he learned English as a third
language, and worked at various financial institutions.  SOF §3, Nos. 7, 9; Timokhine Test.

8.      In 1999, Timokhine founded ATFC, a Connecticut corporation.  SOF §3, Nos. 3,
10; Timokhine Test.  Timokhine is ATFC's president and sole principal.  SOF §3, No. 4;
Timokhine Test.  In 2007, Timokhine became an American citizen.  Timokhine Test.

**B.  *Egg Shipping Business***

9.      As both parties testified, Karpman and Timokhine are distant relatives of some
relation.  Karpman Test.; Timokhine Test.

10.      In 2004, Karpman and Timokhine, via their respective companies, Interlink and
ATFC, entered into a business relationship.  SOF §3, No. 11; Timokhine Test; Karpman Test.

11.      In 2005, Interlink and ATFC began a joint project to export boiler hatching eggs –
eggs used for meat production – to Russia and CIS countries.  SOF §3, No. 11.  At the initiation
of the egg shipping business, the parties orally agreed to split the profits of the business equally at

4

50% to each party.  SOF §3, No. 11; Timokhine Test.; Karpman Test.  The parties, however, did not enter into a written contract memorializing their early business relationship, the duties of each party, or the compensation agreement.  Karpman Test., Vol. III, 449:22-451:2, 509:13-15, 515:24-516:1; Timokhine Test., Vol. I, 172:6-8, 173:14-19.

12.     The parties agreed that Interlink would be the face of the egg shipping business. Timokhine Test.  Interlink contracted with both U.S.-based egg suppliers and Russian or CIS country-based chicken producers.  SOF §3, Nos. 12, 13; Timokhine Test.  Interlink would purchase broiler hatching eggs from United States suppliers, take custody of the eggs, and then arrange for their overseas transport and delivery in Russia or other CIS countries.  Karpman Test., Vol. III, 447:1-448:12; Timokhine Test., Vol. I, 32:25-33:3.  As the face of the operation, Interlink was the named party in all contracts from purchasing from U.S.-based producers through transportation to Russian and CIS purchasers.  SOF §3, Nos. 12, 13; Karpman Test.; Timokhine Test.

13.     ATFC and Timokhine were active participants in the egg shipping business. Timokhine Test.; Karpman Test.  Timokhine was involved to varying degrees in negotiations with U.S. suppliers, with the drafting of purchase and exclusivity agreements, veterinarian clearance processing, the keeping of Interlink's business documents, and management of Interlink's bookkeeping and finances.  Timokhine Test.; Karpman Test.

14.     The parties also agreed that Timokhine would have the title of Chief Financial Officer in order to more easily represent the Interlink-ATFC efforts, but that he would receive no additional compensation for the title.  SOF §3, No. 11; Timokhine Test.; Karpman Test.

15.     Karpman testified that he personally conducted all negotiations related to transportation of the eggs from the United States to overseas.  Karpman Test.  At times, it appears

5

that both Timokhine and Karpman were involved in negotiations.  Timokhine Test., Vol. I, 40:22-24, 173:12-13; Karpman Test., Vol. III, 390:1-10, 465:17 to 466:10.

16.     Timokhine also testified that all issues were discussed jointly and approved jointly. Timokhine Test., Vol. I, 41:17-22.  Timokhine explained that the parties realized that "each party brings to the project their own experience, their own knowledge their own capabilities, their own knowledge and their own capabilities and each party will do the best of – the best that each party could do."  Timokhine Test., Vol. I, 42:11-15.

### C. *Coal Business*

17.     In or about December 2008, ATFC and Interlink agreed to purchase 3000 tons of coal to sell in Poland and to split the proceeds of those sales equally.  No agreement to sell and split proceeds from a coal sale appears in any of the trial exhibits.  The only evidence submitted on the coal business was the parties' testimony.  Karpman testified that about 2000 tons of the coal washed into a river resulting from unexpected and catastrophic flooding, and that there were no proceeds—insurance or otherwise—from the lost coal.  Karpman Test., Vol. III, 510:23-512:7.  At trial, Timokhine testified that he was unsure as to the quantity of coal that ATFC had even invested in.  Timokhine Test., Vol. II, 338:1-15.  Timokhine also testified that he does not believe Karpman's versions of events and that he could "make some other suppositions" as to what happened to the coal, but he provided no proof as to his suspicions.  Timokhine Test., Vol. II, 338:9-339:1.

### D. *Exclusivity Agreements*

18.     At issue here are Exclusivity Agreements (also called "Exclusivity Letters") drafted by Timokhine, reviewed by Karpman, and used by Interlink in contracts with U.S.-based egg suppliers.  The Exclusivity Agreements were separate documents, signed and executed by the egg

suppliers and Interlink that established an exclusive relationship between the supplier and Interlink so long as Interlink purchased a stated quantity of eggs per year.  Karpman Test.; Timokhine Test.; *see also* Pl.'s Ex. 3.  The Exclusivity Agreements set out the various conditions of the relationship, obligations of each party, and featured a provision calling for exclusivity of unlimited duration. *See, e.g.*, Pl.'s Ex. 3.

19.     The parties raised issues relating to exclusivity provisions with three U.S.-based suppliers:  Morris Hatchery, Inc. ("Morris Hatchery"), CWT Farms International, Inc. ("CWT"), and Keith Smith, Inc. ("Keith Smith").

20.     The exclusivity provision in the Morris Hatchery Agreement reads: "The terms of this exclusivity letter will be valid for unlimited period of time as long as Interlink honors its obligations to buy from MHI [Morris Hatchery] at least 1.0 million broiler hatching eggs per year on the terms indicated above."  Pl.'s Ex. 3.  There are three Exclusivity Agreements with Morris Hatchery.  The first is dated January 3, 2007.  *Id.*  The second is an amendment to the 2007 agreement, expanding the territory covered by exclusivity provision.  *See* Defs.' Ex. 565.  The third version, dated October 27, 2008, signed by Karpman, reduced the quantity of eggs to be purchased by Interlink from 1.0 million to .5 million.  *See* Defs.' Ex. 567.

21.     The duration provisions in the CWT and Keith Smith Exclusivity Agreements use similar language and have the same unlimited duration term.  The CWT Agreement, dated November 15, 2005, states: "These exclusive relations between CWT and Interlink will be valid for unlimited period of time and can be terminate [sic] only based on the mutual agreement between the CWT and Interlink."  Pl.'s Ex. 1.  The Keith Smith Agreement, dated August 19, 2009, states: "These exclusive relations between Keith Smith and Interlink will be valid for

unlimited period of time and can be terminated by either party with sixty (60) days' notice in writing to the other party."  Pl.'s Ex. 14.

22.    Timokhine testified that he drafted the Exclusivity Agreements, including the unlimited duration term, upon instruction from and with approval by Karpman.  Timokhine Test. at Vol. I, 175:23-179:8.  Karpman testified that the unlimited duration term would benefit Interlink. Karpman Test.  Karpman and Timokhine testified that the Exclusivity Agreements were drafted, signed, and put into effect without consultation by a lawyer until after ATFC and Timokhine left the egg shipping business.  Karpman Test.; Timokhine Test.

23.    Karpman also testified that Timokhine never held himself out to be a lawyer or to have legal training.  *See* Karpman Test., Vol. III, 444:16-23; Timokhine Test., Vol. I, 176:3-6.

24.    Timokhine signed the November 2005 CWT Agreement and the August 2009 Keith Smith Agreement on behalf of Interlink.  Pl.'s Exs. 1, 14; Timokhine Test.  Karpman was involved in the negotiations with Morris Hatchery and signed the January 2007 Agreement with Morris Hatchery, the November 2007 Amendment to that agreement, and the 2008 Morris Hatchery Agreement.  *See* Def.'s Exs. 508, 565, 567; Karpman Test.

    a.    *CWT*

25.    On or about August 28, 2008, CWT filed a Notice and Demand for Arbitration on Interlink.  *See* Defs.' Ex. 592.  CWT alleged that Interlink had violated terms of the parties' purchase agreements.  *See id.*  Interlink counterclaimed for violation of the parties' exclusivity agreement.  *See id.*

26.    On June 4, 2009, the arbitration panel issued its Final Award on Arbitration, and found the exclusivity agreement enforceable, but the unlimited duration term of the exclusivity

agreement to be unreasonable and unenforceable.  *See id.*  The panel limited the exclusivity period to January 23, 2010, one year past the termination of the parties' business relationship.  *See id.*

27.    On June 23, 2009, Interlink filed a petition to vacate the arbitration award in the United States District Court for the District of New Jersey, arguing that restrictive covenants of unlimited duration in the Exclusivity Agreement were not unreasonable if other conditions were met.  *See id.*  Karpman testified that the District Court upheld the arbitration panel's decision that the provision was invalid.  Karpman Test., Vol. III, 472:1-3, 476:2.  Karpman testified that during this arbitration he finally learned how the United States treats exclusivity agreements that contain terms of unlimited duration.  Karpman Test., Vol. III, 476:3-15.

    b.  *Morris Hatchery and Florida Lawsuit*

28.    Interlink and Morris Hatchery entered into an exclusive business relationship, with a similar Exclusivity Agreement with the same unlimited duration term as in the CWT agreement. The original, as quoted above, was signed in January of 2007.  SOF, §3, No. 14.  Again, on or about November 27, 2007, an addendum to the 2007 agreement was entered into, expanding the territory covered by exclusivity provision to Ukraine, except for one company.  *See* Defs.' Ex. 565.  At the time of the negotiation for the amendment, the company was unknown; it was later revealed to be Agro-Oven, a company Interlink had tried unsuccessfully to contract with directly. Karpman Test.

29.    Karpman testified that he was involved in the negotiations and signature of the 2007 Amendment, but it was Timokhine who again drafted the relevant documents.  Karpman Test., Vol. III, 466:1-10.

30.     As noted, *supra*, the third version, dated October 27, 2008, signed by Karpman, reduced the quantity of eggs to be purchased by Interlink from 1.0 million to .5 million.  *See* Defs.' Ex. 567.

31.     On June 28, 2010, Timokhine sent an email to Ed Morris to begin discussions on contract renewals.  Timokhine Test.; Pl.'s Ex. 17.  The email was broken down into three sections: (1) the Exclusivity Agreement; (2) the Purchase Agreement; and (3) the Egg Placement Agreement.  *Id.*  Despite the Exclusivity Letter's unlimited duration term, under the section on Exclusivity Agreement, Timokhine stated: "[t]he exclusivity letter regarding the broiler hatching eggs will expire at the end of this year and we would like to propose [sic] you to extend the validity of this agreement."  *Id.*  Timokhine testified that he had made a mistake, copying and pasting the language from the Purchase Agreement section, which had an expiration date, and sent the email without correcting the mistake.[5]  Timokhine Test., Vol. I, 69:1-6.

32.     In late 2010, Morris Hatchery filed for declaratory judgment in the United States District Court for the Southern District of Florida to determine that the Exclusivity Agreement expired at the end of 2010.  SOF §3, No. 16; Pl.'s Ex. 29.  Interlink alleged Morris Hatchery violated the terms of the Exclusivity Agreement and counterclaimed for breach of contract.  SOF §3, No. 18.  The litigation was in Interlink's name alone.

33.     Timokhine and Karpman testified that they both flew to Florida for the trial, and that Timokhine was a witness in the trial.  Timokhine Test.; Karpman Test.  They each paid their own expenses, including airfare, hotels, and other costs.  Timokhine Test.; Karpman Test.

---

[5] The Purchase Agreement section states: "The purchase agreement regarding the broiler hatching eggs will expire at the end of this year and we would like to propose [sic] you to extend the validity of the agreement."  Pl.'s Ex. 17.

34.     Timokhine testified that he and Karpman had agreed, pursuant to their original agreement, to cover their own costs and split proceeds of the litigation at 50% and 50%. Timokhine Test., Vol. II, 193:10-18.  Timokhine testified that following the oral agreement with Karpman, Timokhine memorialized their agreement and emailed it to Karpman and Interlink's litigation counsel, Alan L. Frank Law Associates, P.C.  Defs.' Ex. 519; Timokhine Test., Vol. II, 202:23-203:16.  Throughout the litigation, Alan Frank's office, including Alan Frank himself, sent correspondences to Karpman and Timokhine, including a settlement offer, invoice for services and costs, and updates on the status of the case.  *See, e.g.,* Defs.' Exs. 542, 543.  One letter included an invoice for the amount of $12,596.01.  Defs.' Ex. 542.  Timokhine testified that under his understanding of the payment agreement, he was to pay half of the costs, and sent a check for $6,298, which was cashed by Alan Frank's office.  *See* Defs.' Ex. 512; Timokhine Test.  Interlink also paid half of the invoice by check for $6,298.  *See* Defs.' Ex. 521.

35.     On a separate occasion, Alan Frank sent an invoice for an additional $40,000.  As before, Timokhine sent a check for half of the costs.  Defs.' Exs. 529, 530.  Interlink, however, covered the $40,000 and returned/reimbursed the amount back to ATFC and Timokhine. Timokhine Test., Vol. II, 214:10-17.  Karpman testified that the parties had no agreement to share any of the proceeds of the Florida litigation and that Interlink paid for the litigation, after reimbursing Timokhine for any monies paid.  Karpman Test., Vol. III, 412:2-413:4.

36.     In May 2012, the jury returned a verdict in favor of Interlink on the breach of contract counterclaim and awarded a judgment of $2,066,711.02.  SOF §3, No. 21.  The judgment was paid to Interlink.  *Id.*

37.     Prior to the return of the jury's verdict, however, the Court granted summary judgment for Morris Hatchery, finding that the unlimited duration term of the exclusivity provision

was invalid, and deemed the exclusivity provision expired as of December 31, 2010.  Pl.'s Ex. 29, at 6-11; Karpman Test., Vol. III, 380:2-16.   Interlink did not appeal the summary judgment decision or the jury award.  Karpman Test.

### c.  *Keith Smith, Inc.*

38.     In 2007, Interlink began to purchase broiler hatching eggs from Keith Smith Inc. ("Keith Smith").  SOF §3, No. 22.

39.     On August 19, 2009, the parties entered into an exclusivity agreement, which like the Morris Hatchery and CWT Exclusivity Agreements, required Keith Smith to have exclusive dealings with Interlink provided Interlink purchased a certain quantity of eggs per year.  SOF §3, Nos. 23-24; Pl.'s Ex. 14.

40.     On February 7, 2012, Eddy Slick, Director of Sales for Keith Smith, emailed Timokhine to terminate the exclusivity contract with Interlink because Interlink had failed to place sufficient orders to meet the minimum annual purchase volume of broiler hatching eggs from Keith Smith for 2011.  Pl.'s Exs. No. 19; Slick Test., Vol. II, 271:21-272:11.

41.     Timokhine wrote to Eddy Slick and Bud West, among others, in attempts to rekindle the relationship.  *See* Pl.'s Ex. 18.  On February 15, 2012, Timokhine sent an email to Bud West indicating interest by a Russian buyer for five to six million eggs in two months, and over seventy million eggs over the course of the year, which West indicated Keith Smith would consider.  Pl.'s Ex. 20.  Eddy Slick testified that based on this email, he believed Timokhine "was reaching out from his new company which is referenced in the e-mail, U.S.A. ATFC and would not be working with Interlink."  Slick Test., Vol. II, 275:2-4.

42.     On March 30, 2012, Timokhine emailed Bud West to inform him that he was leaving the business with Interlink.  *See* Pl.'s Ex. 27.  Timokhine informed West of his new contact

information, including his email address, and concluded the email with the following: "Don't hesitate to contact me if you need any help and assistance in developing your poultry business in Russia. I hope that good business and personal relations we established last years [sic] will be a strong foundation for our future productive and mutually beneficial cooperation." *Id.*

43.     Following Timokhine's departure from the Interlink egg shipping business, Interlink and Keith Smith re-engaged in discussions to continue business. Karpman testified that Keith Smith and Interlink discussed a new agreement in August 2012. *See* Karpman Test. On September 5, 2012, the parties signed and dated a new Exclusivity Agreement, which itself was dated August 2, 2012. *See* Defs.' Ex. 524; SOF §3, No. 28.

**E.** *Dissolution of the Interlink-ATFC Egg Shipping Business*

44.     In April 2011, Karpman sought to reduce ATFC's and Timokhine's share of the egg shipping business profits. *See* Pl.'s Exs. 23, 61, 75. Karpman testified that he informed Timokhine that he was changing the ratio from a 50% per party profit-sharing arrangement, to 70% to Interlink and 30% to ATFC. Karpman Test., Vol. III, 393:3-7. The parties would continue to cover their own expenses and ATFC was to take on an additional share of office rent and communication expenses. *See* Pl.'s Ex. 61; *see also* Karpman Test; Timokhine Test. Their roles in the business would remain the same. Karpman Test.; Timokhine Test. Karpman testified that he reduced ATFC's share of the profits because of Timokhine's poor job performance, noting in particular the problems with the Exclusivity Agreements. Karpman Test., Vol. II, 368:18-371:1-3; 393:3-394:15. The new profit-sharing formula was proposed as an ultimatum: either Timokhine agreed to the reduced profit-sharing or Timokhine would leave the business. Timokhine Test.; Karpman Test. Karpman testified that the conversation took place at the Interlink office and that Timokhine called the next day to accept these changes. Karpman Test., Vol. III, 395:5-9; 397:2.

13

Karpman also testified that Timokhine continued to work in the egg shipping business, and that his continued participation meant that he accepted the new 70/30 split agreement.  Karpman Test.

45.     Timokhine testified that he did not accept the 70/30 split and in later emails discussed his rejection of the compensation reduction at the time it was proposed.  Pl.'s Exs. 23, 61, 75.  Timokhine further testified that he believed Karpman had accepted his refusal of the 70/30 split, and the parties continued operating under the original 50/50 profit sharing through 2011. Timokhine Test., Vol. II, 226:1-15.

46.     In late 2011 and early 2012, the business relationship between Interlink and ATFC deteriorated further.  Timokhine testified that the relationship declined because Karpman was refusing to share in the profits in accordance with their 50/50 profit sharing agreement.  Timokhine Test.

47.     On March 8, 2012, Timokhine sent an email outlining his duties and participation in the business and outlined several options for payments and business wrap up.  Pl.'s Ex. 23.  On March 31, 2012, the parties terminated their working relationship and stopped their collective egg shipping business efforts.   SOF §3, No. 25.

**F.  *ATFC-Keith Smith Business Agreement***

48.     As noted previously, Timokhine testified that on March 30, 2012, as the Interlink-ATFC business relationship was winding up, he sent an email to Keith Smith, notifying them of his departure from the Interlink business and stating: "Don't hesitate to contact me if you need any help and assistance in developing your poultry business in Russia.  I hope that good business and personal relations we established last years [sic] will be a strong foundation for our future productive and mutually beneficial cooperation."  *See* Pl.'s Ex. 27.

49.     Following Timokhine's departure from Interlink, in April 2012, Keith Smith and ATFC entered into their own business relationship with Keith Smith, hiring ATFC for consulting and brokerage services to sell eggs directly to customers in Russia and the CIS Countries. Timokhine Test.; *see also* Pl.'s Exs. 28, 39 (the "Keith Smith-ATFC Agreement").  The Keith Smith-ATFC Agreement was signed on April 25, 2012.  Pl.'s Ex. 39.

50.     The Keith Smith-ATFC business ramped up quickly.   On April 26, 2012, Timokhine sent an email announcing Keith Smith's first ATFC client, a Russian company called ZAO "Belaya Ptica" and their subsidiary ZAO "Zagorye," referred to as White Bird.  *See* Pl.'s Ex. 40.  The email also discussed some of the logistics of farm visits.  *See id.*  Throughout June, members of Keith Smith and Timokhine emailed regarding various aspects of a potential agreement between White Bird and Keith Smith.  *See* Pl.'s Exs. 48, 49, 50.  Timokhine also sought Keith Smith's help in sending out letters of introduction to other Russian meat producers.  *See* Pl.'s Exs. 51, 56, 57, 59.  In late July, Keith Smith executed a contract to sell eggs to White Bird. Defs.' Ex. 573.

51.     The Keith-Smith-ATFC agreement was short-lived.   On August 3, 2012, Timokhine sent an email to Keith Smith indicating problems with the signature and number of executed contracts with White Bird.  *See* Pl.'s Ex. 65.

52.     On August 7, 2012, Timokhine wrote an email to Keith Smith in which Timokhine states "I am not interesting [sic] to continue these activity [sic] without your support and would like to propose to cancel the agreement we have."  Pl.'s Ex. 69.

53.     On August 17, 2012, Timokhine emailed Keith Smith seeking confirmation of the end of their business relationship and requesting permission to contact those businesses to whom he had sent letters of introduction to inform them of the cancellation of the Keith Smith-ATFC

business relationship.  *See* Pl.'s Ex. 70.  Timokhine wrote: "The agreement between Keith Smith Company, Inc. and American Trade and Financial Corporation dated April 25, 2012 is cancelled as of September 17, 2012 (one month from your today notice)."  *Id.*

54.     Timokhine sent several follow up emails regarding the cancellation letters on August 20, 21 and 31.  *See* Pl.'s Exs. 71-73; Timokhine Test.  After these emails, Timokhine did not have any further business-related communications with Keith Smith.  Timokhine Test., Vol. I, 183:18-184:9.

55.     Eddy Slick also testified that Keith Smith never paid ATFC any money because there was never any shipment of goods.  Slick Test., Vol. II, 312:15-20.

### G.  *The Non-Compete Agreement*

56.     At some point between May 2012 and early June 2012, Karpman forwarded Timokhine a draft of a Non-Compete Agreement ("NCA").  Karpman Test; Timokhine Test.

57.     In an email response, Timokhine outlined what he felt had been his input to the business and expenses, and he proposed a final resolution to their relationship which would include his leaving the company as of April 1, 2012, after certain conditions were met, including the proper distribution of profits from the 2010, 2011, and partial 2012 years, and the receipt by him of 50% of the monies due from the Morris lawsuit.  Pl.'s Ex. 61; Timokhine Test.

58.     Despite his response, on August 3, 2013, Timokhine signed the NCA.  *See* Pl.'s Ex. 67; Defs.' Ex. 515.  The NCA incorporates three restrictions: non-competition, non-solicitation, and non-disclosure.  In relevant part, the NCA reads:

> 1.1 In view of the fact that the AGENT's work for the Company has brought the AGENT into close contact with many confidential affairs of the COMPANY not readily available to the public, the AGENT covenants and agrees that the AGENT will not at any time use for the AGENT's personal benefit (including corporate or related parties as defined in the Preamble above) or for the direct or

indirect benefit of any third party or disclose to an unauthorized person, firm or corporation any information, documents or materials acquired by the AGENT through employment by the COMPANY, including without limitation, information, whether oral, written or electronic, concerning the business or technology of the COMPANY including but not limited to, the COMPANY's customer and vendor or suppliers lists, price data, its relations with employees, contactors, vendors, clients or agents, its manner of operation or its inventions, designs, plans, processes or other proprietary information or trade secrets.

* * *

2.1 AGENT agrees that during the period of FIVE YEARS (5 years) commencing with the signing of this agreement he will not, without the COMPANY's prior express written consent, engage in any (part-time or full-time) employment, consulting or other business which is directly or indirectly connected with (other than by virtue of ownership of less than 2% of the outstanding capital stock of any class of publically-traded company) any business that is a client of the COMPANY and for which the AGENT performed, bought or sold services on the COMPANY's behalf or which is in competition with the COMPANY.

* * *

3.1 AGENT agrees the AGENT will not, during the FIVE YEARS (5 years) commencing with the signing of this agreement, solicit, service, do business with or sell to any customer or client of the COMPANY that purchased any product or service from the COMPANY for which AGENT performed or sold services on the COMPANY's behalf.

Section 4 sets forth the consideration for the NCA, stating:

AGENT further acknowledges that the restrictive covenants set forth in this Agreement are reasonably necessary for the protection of the COMPANY's legitimate business interests.  Since the AGENT is leaving a business relationship with the COMPANY, AGENT agrees to accept the sum of 780,504.75 ($       ) and other good and valuable consideration, the sufficiency of which is hereby acknowledged, as sufficient and due consideration for the faithful performance of his obligations under this agreement.

17

*Id.* The NCA also included a clause that awards "all reasonable legal fees and expenses" incurred successfully in enforcing the covenants and terms of the NCA. *Id.*

59.    Timokhine testified that he understood the NCA to be an ultimatum – that the contract was not for negotiation and that he could not make alterations. Timokhine Test. Further, Timokhine testified that he felt pressured into the accepting the agreement, as Karpman knew he was in need of money for his expenses and to cover the costs of his wife's medical care. Timokhine Test.

60.    Karpman testified that the amount of consideration—$780,504.76—was calculated and chosen by Timokhine. Karpman Test., Vol. III, 516:8-18. Karpman further testified that if it were up to him, the amount of consideration would have only been $50,000. Karpman Test., Vol. III, 516:14-18.

## III.    **CONCLUSIONS OF LAW**

### A.    *Plaintiff's Claim for Breach of the Non-Compete Agreement (Plaintiff's Complaint, Count I)*

The first question presented to this Court is whether Timokhine and/or ATFC breached the NCA. In order to resolve any of the claims or counterclaims currently before the Court, however, the Court must first determine whether the NCA is a valid contract.

#### a.    *Validity of the NCA*

To prove the existence of a valid contract between the parties, the plaintiff must show: "mutual assent, consideration, legality of object, capacity of the parties and formality of memorialization." *Cohn v. Fisher,* 287 A.2d 222, 224 (N.J. Super. Ct. App. Div. 1972). The validity of a contract, including a non-compete agreement, "rests in part upon the existence of good and sufficient consideration." *Hogan v. Bergen Brunswig Corp.*, 378 A.2d 1164, 1167 (N.J. Super. Ct. App. Div. 1977) (citing *A. Hollander & Son v. Imperial Fur Blending Corp.*, 2 N.J. 235,

249 (1949) (further citations omitted)).  An agreement will fail for lack of consideration where the purported consideration for the agreement arises out of a preexisting legal duty.  *Hyman v. WM Fin. Servs., Inc.*, No. 07-3497, 2008 WL 1924879, at *3 (D.N.J. Apr. 29, 2008); *Berel Co. v. Sencit F/G McKinley Assocs.,* 710 F. Supp. 530, 536 (D.N.J. 1989) (citing Restatement (Second) of Contracts § 73 & Cmt. (1981)); *Gray v. Martino,* 103 A. 24, 24 (N.J. 1918).  Thus, where a defendant's alleged obligation to pay plaintiff under a contract is already required by an earlier duty, there is insufficient consideration for the contract.  *Shakib v. Back Bay Rest. Grp., Inc.*, No. 10-4564, 2011 WL 4594654 (D.N.J. Sept. 30, 2011); *U.S. Land Res., LP v. JDI Realty LLC*, No. 08-5162, 2009 WL 2488316 (D.N.J. Aug. 12, 2009); *Merlo v. Fed. Exp. Corp.*, No. 07-4311, 2010 WL 2326577 (D.N.J. June 7, 2010).

New consideration need not be large sums or dramatic promises.  The Restatement (Second) of Contracts, §73, notes that, with respect to contractual duties, "[s]light variations of circumstance are commonly held to take a case out of the rule, particularly where the parties have made an equitable adjustment in the course of performance of a continuing contract."  *Id.*  Thus, "similar performance is consideration if it differs from what was required by the duty in a way which reflects more than a pretense of bargain."  *Id.*

On August 3, 2012, the parties executed the NCA.  *See* Pl.'s Ex. 67; Defs.' Ex. 515. Interlink asserts that it paid Timokhine approximately $780,504.75 as consideration for his signing the NCA.  Defendants assert that Plaintiff was under a preexisting duty to pay the $780,504.75 based on the parties' oral profit-sharing agreement.  Interlink, on the other hand, claims that it owed nothing under a preexisting legal duty, and the $780,504.75 was only consideration for the NCA.  Based upon the trial testimony of the principals, it is certainly clear that they had widely divergent views regarding their economic relationship in 2012.  The Court finds that the

$780,504.75 paid to Defendant was, at least in part, consideration for the NCA. The Court also finds, however, that Interlink had a preexisting duty to pay some amount of money under the party's profit-sharing agreement, but the question of how much poses a problem. Karpman and Timokhine testified to opposite effects on the amount owed under the profit-sharing agreement. Karpman argued for a 70/30 split, with no share of the proceeds from the Florida lawsuit. Timokhine argued for a 50/50 split, including the Florida lawsuit proceeds. Both parties testified to accepting his own proposal and rejecting the other.

As previously discussed, a valid contract requires mutual assent. *Cohn,* 287 A.2d at 224. Clearly, the parties mutually agreed to split profits to some degree. Moreover, both parties agreed to the NCA, and both agreed that a payment of $780,504.75 would be made to Timokhine. Timokhine complained of not receiving monies from the 2011 and 2012 years plus monies from the lawsuit, but he still agreed to accept the amount of $780,504.75 and he did sign the NCA. Karpman, although he disputes owing any monies to Timokhine and testified that he felt he should have only had to pay $50,000 for the NCA, nevertheless agreed to pay $780,504.75 to Timokhine. Given all of the testimony and all of the circumstances surrounding the parties' relationship at that time, it appears most likely to the Court that the payment to Timokhine of $780,504.75 and the signing of the NCA represented an effort by both sides to come to some sort of overall agreement concerning all of their claims against each other and to finally part ways. Thus, the Court finds that the $780,504.75 represents both consideration for the NCA and reimbursement of the monies owed under the egg shipping business. The Court therefore concludes that the $780,504.75 constitutes valid consideration for both the NCA *and* for the discharge of any remaining legal

obligations under the profit-sharing agreement.  As a result, the NCA, at least preliminarily, *see infra* subsection b, constitutes a valid agreement.[6]

b. *Scope of the NCA*

Defendants argue that even if the $780,504.75 is valid consideration for the NCA, the NCA is unduly broad as to time and scope and thus void as against public policy.  Restrictive covenants in employment contracts are enforceable under New Jersey law if they (1) protect a legitimate interest of the employer; (2) impose no undue hardship on the employee; and (3) are not injurious to the public.  *See Solari Indus., Inc. v. Malady*, 264 A.2d 53, 56 (N.J. 1970).  The court must assess an agreement's reasonableness on a case-by-case basis.  *Pierson v. Med. Health Ctrs., P.A.*, 869 A.2d 901, 904 (N.J. 2005).  "A court therefore may not presume that a temporal or geographical limitation deemed reasonable in one case is necessarily reasonable in another." *Truong, LLC v. Tran*, No. A-5752-11T1, 2013 N.J. Super. Unpub. LEXIS 64, 2013 WL 85368, at *8 (N.J. Super. Ct. App. Div. Jan. 9, 2013).

In determining the reasonableness of an agreement's limitations, courts also consider three additional factors in determining whether a restrictive covenant is overbroad: "its duration, the geographic limits, and the scope of activities prohibited."  *The Community Hosp. Grp., Inc. v. More*, 869 A.2d 884, 897 (N.J. 2005).  "Each of those factors must be narrowly tailored to ensure the covenant is no broader than necessary to protect the employer's interests."  *Id.*  However, where a non-compete agreement seeks to impose overbroad restrictions, courts may disregard the

---

[6] There has been a suggestion by Timokhine that he signed the NCA under duress because his wife was sick and he needed money for her care.  At trial, however, this suggestion was supported only by one passing and rather unconvincing comment by Timokhine.  Timokhine Test., Vol. II, 191:24-192:6.  Timokhine made little effort at trial to explain why he did not have other funds to devote to his wife's care or to otherwise elaborate upon his claim of duress, and based upon the evidence before it, the Court declines to invalidate the NCA on such a vague assertion.

covenant or give it complete or partial enforcement to the extent reasonable.  *See Cost Reduction Solutions v. Durkin Grp., LLC*, No. A-0046-07T2, 2008 WL 3905679, at *3 (N.J. Super. Ct. App. Div. Aug. 22, 2008) (citing *The Community Hosp. Grp., Inc.*, 869 A.2d at 897); *Whitmyer Bros., Inc. v. Doyle*, 274 A.2d 577, 580-81 (N.J. 1971).  "Ordinarily, if a restrictive covenant is overly broad or unreasonable, the Court may 'limit[] . . . its application concerning its geographical area, its period of enforceability, and its scope of activity,' to make it reasonable."  *Laidlaw, Inc. v. Student Transp. of Am.*, 20 F. Supp. 2d 727, 757 (D.N.J. 1998) (quoting *Coskey's Television & Radio Sales and Serv., Inc. v. Foti*, 602 A.2d 789, 793 (N.J. Super. Ct. App. Div. 1992); *Karlin v. Weinberg*, 390 A.2d 1161, 1168 n.4 (N.J. 1978) (explaining that courts may "blue pencil" or "compress or reduce the geographical areas or temporal extent of their impact so as to render the covenants reasonable").

The NCA prohibits Defendants, for a period of five years, from competing with Interlink anywhere in the world, regardless of business area or industry, from engaging in any employment or business with any Interlink client, supplier or any business that Interlink deems a competitor, or soliciting any business with any Interlink customer, client, supplier or vendor.  The Court finds that some of these restrictions are overbroad and unreasonable.  First, the Court finds that the temporal limitation of five years is unreasonable and reduces that limitation to three years.  Second, the Court finds the lack of geographical restriction to be unreasonable and confines the non-competition/non-solicitation portion of the NCA to clients doing business in Russia and CIS countries.  Finally, the Court limits the scope of the NCA to prohibit Defendants only from competing and soliciting clients in the type of egg-shipping business that both Karpman and Timokhine participated together in before their 2012 parting of ways.  With these modifications in place, the Court finds that the NCA is reasonable and enforceable.

22

c. *Breach of NCA by Defendants*

The Court now turns to whether, as Plaintiff alleges in Count I of its Complaint, Defendants breached their obligations under the NCA.  Dkt. No. 1, Compl., at ¶¶ 43-53.  "To prevail on a breach of contract claim under New Jersey law, a plaintiff must establish three elements: (1) the existence of a valid contract between the parties; (2) failure of the defendant to perform its obligations under the contract; and (3) a causal relationship between the breach and the plaintiff's alleged damages."  *Sheet Metal Workers Int'l Ass'n Local Union No. 27, AFL-CIO v. E.P. Donnelly, Inc.*, 737 F.3d 879, 900 (3d Cir. 2013) (citing *Coyle v. Englander's*, 488 A.2d 1083, 1088 (N.J. Super. Ct. App. Div. 1985)); *RNC Sys., Inc. v. Modern Tech. Grp., Inc.*, 861 F. Supp. 2d 436, 444-45 (D.N.J.) (finding that breach of contract "requires proof of three elements: (1) the existence of a valid contract; (2) a breach of that contract; and (3) resulting damage to the plaintiff."); *Murphy v. Implicito*, 920 A.2d 678, 689 (N.J. Super. Ct. App. Div. 2007).

The Court finds that Plaintiff has failed to establish a breach of the NCA.  Plaintiff's primary evidentiary items in support of this claim are the emails sent from Timokhine to Keith Smith after Timokhine signed the NCA on August 3, 2012.  The Court finds that these emails do not constitute a breach of the NCA.  The correspondences sent by Timokhine evidence a desire to end the business relationship he had previously established with Keith Smith prior to signing the NCA and discuss how Timokhine wished to send out letters indicating his removal from the egg shipping industry.  This is further corroborated by Keith Smith representative Eddy Slick who testified that it was his understanding that the emails were intended to wind down any business relations between ATFC and Keith Smith.  *See* Slick Test., Vol. II, 311:11-15.  Eddy Slick also testified that Keith Smith never paid ATFC any money and that there was never any shipment of goods.  *See* Slick Test., Vol. II, 312:15-20.

23

Further, the NCA does not require Timokhine to stop all communications.  It does not prevent Timokhine from protecting his personal and business reputation, nor does it require disclosure of the NCA. The NCA prevents disclosure and use of Interlink's information and prevents Defendants' employment and solicitation of business in the egg shipping industry. Plaintiff did not present any evidence that indicates an attempt to solicit business or compete with Interlink after the agreement was signed on August 3, 2012.[7]  The Court finds that Timokhine's actions were well within the confines of the NCA.  Moreover, his actions in contacting Keith Smith to effectuate the wind-down of his activities, which were not proscribed until the signing of the NCA on August 3, 2012, do not constitute a breach of the NCA.

Finally, a demand letter from counsel, such as that from Timokhine's counsel to Karpman's counsel a few months after the NCA was signed, even when the letter states the agreement is *void ab initio*, is not in and of itself a breach of the NCA.  *See Sheet Metal Workers*, 737 F.3d at 900 (finding breach of contract requires "failure of defendant to perform its obligations under contract").  Timokhine testified that despite his belief that the NCA was void, he has always abided by and continues to abide by the terms of the agreement.  Plaintiff has not submitted any evidence of Defendants' participation in the egg shipping industry following the letter from Defendants' counsel.  Therefore, the Court finds that Plaintiff has received the benefit of its bargain and Defendants did not breach the NCA.[8]

---

[7] Plaintiff submitted one email sent by Timokhine on August 3, 2012 in which Timokhine discusses the White Bird contract with Keith Smith.  Pl.'s Ex. 65.  This email was sent at approximately 9:11 A.M.  Timokhine, however, testified that he signed the NCA in the late afternoon or evening of August 3, 2012.  *See* Timokhine Test., Vol. I, 147:12-17.  Thus, while Timokhine had the draft of the NCA, he had not yet signed it, and the email cannot constitute a breach of a contract as there was no assent to the agreement at that time.

[8] Plaintiff also claims it is entitled to an award of attorneys' fees based on the clear language in the NCA.  The NCA provides that "AGENT agrees that COMPANY is entitled to the cost of all reasonable legal fees and expenses incurred in *successfully* enforcing the covenants contained

**B.** ***Defendants' Counterclaims for Breach of Contract (Amended Counterclaim, Counts I, II, and VII), Equitable Counterclaims for Unjust Enrichment (Amended Counterclaim, Count III) and Promissory Estoppel (Amended Counterclaim, Counts IV and VIII), and Counterclaim for Declaratory Judgment (Amended Counterclaim, Count V)***

Defendants assert claims for breach of contract (Counterclaim Counts I and VII), unjust enrichment (Counterclaim Count III), promissory estoppel (Counterclaim Counts IV and VIII), and Declaratory Judgment (Counterclaim Count V) related to the egg shipping business.

First, with respect to the breach of contract claims, Defendants allege that Plaintiff did not pay the monies due to Defendants per the parties' oral profit-sharing agreement for profits from the egg shipping business.  As discussed above, the Court has found that the $780,504.75 paid from Interlink to Defendants constitutes both the profits owed to Defendants pursuant to the egg shipping business plus the consideration for the NCA.  Thus, the Court finds that there is no breach of contract by Plaintiff or Karpman of the profit-sharing agreement in the egg shipping business, or at the very least, any breach that existed when Karpman refused to pay the money following Timokhine's exit from the business has been satisfied by the subsequent payment of the $780,504.75.

With regard to Defendants' unjust enrichment claim, under New Jersey law, a cause of action for unjust enrichment requires proof that "[counterclaim] defendant received a benefit and that retention of that benefit without payment would be unjust." *VRG Corp. v. GKN Realty Corp.,* 135 N.J. 539, 554 (1994). "The most common circumstance for application of unjust enrichment is when a plaintiff has not been paid despite having had a reasonable expectation of payment for services performed or a benefit conferred." *County of Essex v. First Union Nat.'l Bank*, 862 A.2d

---

herein."  Pl.'s Ex. 67, § 16 (emphasis added).  Here, while the Plaintiff prevails on the claim that the NCA is valid, the Court finds that there was no breach of the NCA by Defendants.  Therefore, Plaintiff has not succeeded in enforcing the NCA and is not entitled to attorneys' fees.

1168, 1172 (N.J. Super. Ct. App. Div. 2004), *aff'd in part and rev'd in part*, 186 N.J. 46 (2006). Here, the Court finds that Plaintiff did not receive a benefit without paying Defendants. The Court has found that the $780,504.75 consists of both consideration for the NCA and satisfaction of the remaining monies owed to Defendants under the profit-sharing agreement. Accordingly, Defendants' counterclaim for unjust enrichment fails.

Defendants' counterclaim for promissory estoppel also fails. The elements of promissory estoppel require the party to show that there has been "(1) a clear and definite promise; (2) made with the expectation that the promise will [be relied on]; (3) reasonable reliance; and (4) definite and substantial detriment." *Toll Bros., Inc. v. Bd. of Chosen Freeholders of the City of Burlington*, 194 N.J. 223, 253 (2008). Based on the evidence before the Court, it is clear that the parties' profit-sharing agreement was subject to change, and was far from clear and definite. Moreover, it appears that Defendants profited from the parties' split when Defendants received $780,504.75 as consideration for the NCA and for its portion of the profits of the egg shipping business. Thus, Defendants have also failed to show that they suffered a definite and substantial detriment, and their claim for promissory estoppel must be denied.

Additionally, Defendants advance a counterclaim for a declaratory judgment "that the [NCA] is unenforceable and is a nullity." *See* Dkt. No. 49, Am. Countercl., Count V, ¶ 52. Given that the Court has already concluded that the NCA, as modified, is a valid contract supported by sufficient consideration, this request for a declaratory judgment to the contrary must be denied.

Defendants further seek damages for monies allegedly owed to them in connection with the parties' joint venture related to the coal business. Specifically, Defendants seek damages for breach of contract (Counterclaim Count II), unjust enrichment (Counterclaim Count III), and promissory estoppel (Counterclaim Count IV) relating to the coal business. In or about December

2008, ATFC and Interlink apparently agreed to purchase approximately 3000 tons of coal to sell in Poland and then to split the proceeds of those sales equally. Defendants claim that Interlink and Karpman breached this agreement because they failed to split these proceeds. No agreement to sell and split proceeds from a coal sale appears in any of the trial exhibits. The only evidence submitted on the coal business was the parties' testimony. Karpman testified that about 2000 tons of the coal washed into a river resulting from unexpected and catastrophic flooding, and that there were no proceeds—insurance or otherwise—from the lost coal. Karpman Test., Vol. III, 510:23-512:7. At trial, Timokhine testified that he was not even sure as to the quantity of coal that ATFC had invested in. Timokhine Test., Vol. II, 338:1-15. He also testified that he does not believe Karpman's versions of events and that he could "make some other suppositions" as to what happened to the lost coal. Timokhine Test., Vol. II, 338:9-339:1. Timokhine has failed to provide any actual evidence to substantiate these claims and his speculation that Karpman is hiding the truth about the coal is insufficient to sustain a claim for breach of contract, promissory estoppel, or unjust enrichment. Accordingly, the Court finds that these Counterclaims fail.

### C. Third Party Claim of Fraudulent Misrepresentation (Third Party Complaint, Count II)

Defendants assert a claim for fraudulent misrepresentation against Third-Party Defendant Karpman for his personal role in keeping any monies due to Defendants from them. *See* Dkt. No. 32, Third Party Compl., Count II, ¶¶ 43-50; FPO, §7, ¶¶ 69-94. Under New Jersey law, the elements of a fraudulent misrepresentation claim are: (1) defendant made a material misrepresentation of a presently existing or past fact; (2) with knowledge of its falsity; and (3) with the intent that plaintiff would rely thereon; ( 4) resulting in reasonable reliance; ( 5) to the plaintiff's detriment. *Jewish Ctr. of Sussex Cnty. v. Whale*, 86 N.J. 619, 624-25 (1981). Because the Court finds the NCA to be valid and the $780,504.75 to be both consideration for the NCA and

satisfaction of past due monies, the Court finds that Defendants have been paid and there was no fraudulent misrepresentation relating to the NCA or payment of money owed under the profit-sharing agreement.

### D. Defendants' Counterclaim of Tortious Interference against Interlink (Amended Counterclaim, Count VI) and Third Party Defendant Alexander Karpman (Third Party Complaint, Count III)

Defendants assert a claim against Interlink and Karpman, as a Third-Party Defendant, for interfering with Defendants' contract with Keith Smith after Defendants left the Interlink-ATFC business. *See* Dkt. No. 49, Am. Countercl., Count VI, ¶¶ 55-61; Dkt. No. 32, Third Party Compl., Count III, ¶¶ 51-57. In *Printing Mart-Morristown v. Sharp Elecs.*, 116 N.J. 739, 751-52 (1989), the Court set forth the elements of a claim for tortious interference with contractual relations, indicating that a party must prove (1) the existence of the contract (or the prospective economic relationship); (2) interference which was intentional and with malice; (3) the loss of the contract or prospective gain as a result of the interference; and (4) damages. Defendants allege that in August of 2012, Karpman communicated with Keith Smith representatives and convinced them to terminate their exclusivity agreement with ATFC. Dkt. No. 49, Am. Countercl., Count VI, ¶ 58. However, Defendants offer precious little evidence to support their claim that Karpman engaged in such conduct, and Timokhine himself testified that defendants terminated their own relationship with Keith Smith upon his execution of the NCA. Defendants further predicate their claim of tortious interference upon the invalidity of the NCA. *See* FPO, Defs.' Contested Facts, §7, ¶ 62. As previously discussed, the Court finds that the NCA is a valid, enforceable contract. Accordingly, the Court finds that there was no tortious interference by Plaintiff with Defendants' contract with Keith Smith. Because there is no finding of tortious interference by Interlink, there can be no finding of tortious interference by Karpman.

28

### E.  *Defendants' Breach of Fiduciary Duties (Plaintiff's Complaint, Count 3)*

Plaintiff claims that ATFC and Timokhine stood in a fiduciary relationship to Interlink and owed Interlink a duty to be careful, skillful, diligent and loyal in performance of Interlink's business.  Dkt. No. 1, Compl., Count III, ¶ 73.  Plaintiff further claims that ATFC and Timokhine breached that fiduciary duty to Interlink when ATFC drafted an exclusivity agreement with a term of unlimited duration between Interlink and Morris Hatchery.  *Id.*, at ¶ 74.

"In order to establish a cause of action for a breach of fiduciary duty in New Jersey, a plaintiff must show that the defendant had a duty to the plaintiff, that the duty was breached, that injury to plaintiff occurred as a result of the breach, and that the defendant caused that injury."  *Goodman v. Goldman, Sachs & Co.*, No. 10–1247, 2010 WL 5186180, at *10 (D.N.J. Dec. 14, 2010) (citing *St. Matthew's Baptist Church v. Wachovia Bank Nat. Ass'n*, No. A. 04–4540, 2005 WL 1199045, at *9 (D.N.J. May 18, 2005); *see also In re ORFA Sec. Litig.*, 654 F. Supp. 1449, 1457 (D.N.J. 1987) (explaining that to prove a breach of fiduciary duty, plaintiff must show "a duty, a breach, an injury, and causation").  The duties that arise in the fiduciary relationship "include the duty of loyalty and the duty to exercise reasonable skill and care."  *Inventory Recovery Corp. v. Gabriel*, No. 11-1604, 2012 WL 2990693, at *4 (D.N.J. July 20, 2012).

### a.  *Duty of Care*

The Court must first address whether Defendants owed a fiduciary duty to Plaintiff.  With respect to the first element, "[t]he essence of a fiduciary relationship is that one party places trust and confidence in another who is in a dominant or superior position.  A fiduciary relationship arises between two persons when one person is under a duty to act for or give advice for the benefit of another on matters within the scope of their relationship."  *F.G. v. MacDonell*, 150 N.J. 550, 563-64 (1997) (citing Restatement (Second) of Torts § 874 cmt. a (1979)); *Trianco, LLC v. IBM*, 271 F. App'x 198, 203 (3d Cir. 2008) (finding that a duty arises out of a "special relationship of

29

trust and confidence" between the parties).  Thus, in order to identify the nature and extent of any fiduciary duty between the parties to this case, the Court must first analyze and determine the true nature of the relationship between the parties.

Defendants contend that the business relationship between them and Plaintiff was that of a joint venture.  A joint venture is "[a] special combination of two or more persons where in some specific venture, a profit is jointly sought without any actual partnership or corporate designation." *Burnham v. WMC Mortg. Corp.*, No. 07-6101, 2010 WL 2560657, at *7 (D.N.J. June 21, 2010) (quoting *Wittner v. Metzger*, 178 A.2d 671, 675 (N.J. Super. Ct. App. Div. 1962), *cert. denied*, 37 N.J. 228 (1962)).  "A joint venture is predicated on the same legal event as an employment or partnership contract--an agreement between the parties."  *Material Techs. v. Carpenter Tech. Corp.*, No. 01-2965, 2004 U.S. Dist. LEXIS 28892, at *22-23 (D.N.J. Dec. 14, 2004) (citing *Sullivan v. Jefferson, Jefferson & Vaida*, 400 A.2d 836, 839 (N.J. Super. Ct. App. Div. 1979)); *Wittner*, 178 A.2d. at 674.  The joint venture relationship, however, may be less formal than a partnership.  *Hellenic Lines, Ltd. v. Commodities Bagging & Shipping, Process Supply Co.*, 611 F. Supp. 665, 679 (D.N.J. 1985).  It may be implied wholly or in part from the acts and conduct of the parties, and where there is an explicit agreement, it "need contain no particular form of expression, nor is formality of execution necessary."  *Id.*; *Wittner*, 178 A.2d. at 675.  "It is 'an undertaking usually in a single instance to engage in a transaction of profit where the parties agree to share profits and losses.'"  *Burnham*, 2010 WL 2560657, at *7 (quoting *Ginsberg v. Bistricer*, No. A-5751-03T5, 2007 N.J. Super. Unpub. LEXIS 474, at *32-33 (N.J. Super. Ct. App. Div. Apr. 4, 2007) (internal citation omitted)).  "For a joint venture to have been formed, the parties must have agreed upon the essential terms."  *Id.*  A joint venture agreement will, however, contain some or all of the following elements:

(A) A contribution by the parties of money, property, effort, knowledge, skill or other asset to a common undertaking;

(B) A joint property interest in the subject matter of the venture;

(C) A right of mutual control or management of the enterprise;

(D) Expectation of profit, or the presence of 'adventure,' as it is sometimes called;

(E) A right to participate in the profits;

(F) Most usually, limitation of the objective to a single undertaking or ad hoc enterprise."

*Id.* (quoting *Wittner*, 178 A.2d. at 675).

In this case, it is clear from the facts that many of the essential terms of the subject venture were agreed upon between the parties. In 2004, Karpman and Timokhine, via their respective companies Interlink and ATFC, entered into a business relationship. SOF §3, No. 11; Timokhine Test; Karpman Test. In 2005, Interlink and ATFC began a joint project to export broiler hatching eggs – eggs used for meat production – to Russia and the CIS countries. SOF §3, No. 11. At the initiation of the egg shipping business, although they never entered into a formal written contract, the parties orally agreed to split the profits of the business equally at 50% to each party. *Id.*; Karpman Test., Vol. III, 449:22-451:2, 509:13-15, 515:25-516:1; Timokhine Test., Vol. I, 172:6-8, 173:14-19. The parties also were responsible for their own costs. The parties agreed that Interlink would be the face of the egg shipping business. SOF §3, Nos. 12, 13; Timokhine Test. As the face of the operation, Interlink was the named party in all contracts from purchasing from U.S.-based producers through transportation to Russian and CIS purchasers. SOF §3, Nos. 12, 13; Karpman Test.; Timokhine Test.

The parties' actions and conduct demonstrate their intention to form a joint venture. Both parties contributed their skills, efforts, and knowledge to the venture. Timokhine was involved to

varying degrees in negotiations with U.S. suppliers, was responsible for preparing the drafts of the purchase and exclusivity agreements, the veterinarian clearance processing, the keeping of Interlink's business documents, and management of Interlink's bookkeeping and finances. Timokhine Test.; Karpman Test.  Timokhine also handled transportation reservations and contracts with all transportation companies.  Timokhine Test., Vol. I, 40:1-13.  The parties agreed that Timokhine would have the title of Chief Financial Officer in order to more easily represent the Interlink-ATFC efforts, but that he would receive no additional compensation for the title.  SOF §3, No. 11; Timokhine Test.; Karpman Test.  Karpman testified that he personally conducted all negotiations related to transportation of the eggs from the United States to overseas.  Karpman Test.  At times, however, it appears that both Timokhine and Karpman were jointly involved in negotiations.  Timokhine Test., Vol. I, 40:22-24, 173:12-13; Karpman Test., Vol. III, 390:1-10, 465:17 to 466:10.  Timokhine also testified that all issues were discussed jointly and approved jointly.  Timokhine Test., Vol. I, 41:17-22.  Timokhine testified that the parties realized that "each party brings to the project their own experience, their own knowledge their own capabilities, their own knowledge and their own capabilities and each party will do the best of – the best that each party could do."  Timokhine Test., Vol. I, 42:11-15.  Given all of this evidence, the Court finds that Interlink and ATFC were indeed engaged in a joint venture as that term is defined in the law.

"Joint venturers and partners, respectively, do as a general matter owe fiduciary duties to one another."  *UBI Telecom Inc. v. KDDI Am., Inc.*, No. 13-1643, 2014 WL 2965705, at *10 (D.N.J. June 30, 2014) (citing *Silverstein v. Last*, 383 A.2d 718, 721 (N.J. Super. Ct. App. Div. 1978)).  New Jersey cases decided since the 1919 enactment of the Uniform Partnership Law almost invariably hold that joint ventures are subject to the same legal rules as partnerships.  *See, e.g.*, *Walter v. Holiday Inns, Inc.,* 784 F. Supp. 1159, 1167 n.10 (D.N.J.1992), *aff'd*, 985 F.2d 1232

(3d Cir. 1993); *Hellenic Lines*, 611 F. Supp. at 679.   Under New Jersey's Revised Uniform

Partnership Act, a partner's fiduciary duty is "limited to refraining from engaging in grossly

negligent or reckless conduct, intentional misconduct, or a knowing violation of law."  N.J.S.A.

42:1A-24.   "Gross negligence is defined as 'conduct that comes somewhere between 'simple'

negligence and intentional infliction of harm, or, 'willful misconduct.'"   *Zhang v. Ridgewood*

*YMCA,* No. A-3485-09T2, 2011 WL 589586, at *4 (N.J. Super. Ct. App. Div. Feb. 22, 2011)

(citations omitted).   "Gross negligence requires 'indifference to consequences,' and may be

equated with willful or wanton conduct."  *Id.* (citations omitted).

  *b.  Analysis*

  Plaintiff claims that Defendants breached their fiduciary duty in three ways: (1) Defendants

drafted exclusivity agreements of unlimited duration that were found to be unenforceable; (2)

Timokhine emailed Morris Hatchery that their exclusivity agreement was to expire at the end of

2010 when the parties were operating under an exclusivity period of unlimited duration; and (3)

Defendants failed to secure a completely exclusive relationship with Morris Hatchery and allowed

Morris to set up direct sales with Agro-Oven producers in Ukraine.  *See* Dkt. No. 113, Pl.'s Tr. Br.

at 6-7.

  The Court finds that there has been no evidence or testimony to support a claim that

Defendants challenged actions constitute gross negligence.  Timokhine testified that his role in the

joint venture was to prepare drafts of the exclusivity agreements, which were then reviewed jointly

by Karpman and himself.  Timokhine Test., Vol. I, 44:24-45:2.  Timokhine even testified that it

was Karpman's idea to include the unlimited duration term for these agreements.  Timokhine Test.,

Vol. I, 49:2-4.  Moreover, Timokhine never represented to Karpman that he had any legal training

or that he would secure legal advice.  Thus, it is unreasonable for Karpman to claim that he relied

on Defendants to advise him concerning the legalities of the contractual terms.  As to the emails to Morris Hatchery, Timokhine testified that the email he sent to Morris Hatchery was a mistake, Timokhine Test., Vol. I, 69:1-6, but it certainly does not appear to the Court to approach justifying any finding of gross negligence.  Finally, the Court finds there was no breach of duty related to the allegation that Defendants failed to secure a completely exclusive relationship with Morris Hatchery for producers in Ukraine.  Plaintiff simply did not proffer any evidence that Defendants were grossly negligent in this regard.  In fact, Karpman only testified that Timokhine told him that Morris lied to him about the amendment.  Karpman Test., Vol. III, 390:6-391-8.  Accordingly, the Court finds that Defendants did not act with indifference to the consequences in his business dealings for the joint venture, nor did they act in a grossly negligent fashion.  Defendants merely made decisions on how to best fulfill their duties in the egg shipping business.  The fact that these decisions were not successful to the extent that Plaintiff desired does not, in and of itself, make Defendants' efforts a breach of fiduciary duty.  And, again, these decisions certainly do not rise to the level of gross negligence.  Accordingly, the Court finds that Plaintiff has failed to provide sufficient evidence that Defendants' actions constitute a breach of fiduciary duty.[9]

---

[9] Even if the Court were to conclude that the relationship between Plaintiff and Defendants was not a joint venture, and was instead that of principal and agents, Defendants could not be held liable for breach of fiduciary duty.  "[A]n agent has a duty to the principal to act with the care, competence, and diligence normally exercised by agents in similar circumstances."  Restatement (Third) of Agency § 8.08 (2006); *see also Big M, Inc. v. Dryden Advisory Grp.*, No. 08-3567, 2009 WL 1905106, at *23 (D.N.J. June 30, 2009).

The duty of reasonable care is not, however, a guarantee for success in and of itself.  *See Morris v. Muller*, 113 N.J.L. 46, 49 (1934).  Where an error occurs from a reasonable, but ultimately bad, judgment call, there is no breach of duty.  *See id.*; *Brown v. United Cerebal Palsy/Atl. & Cape May, Inc.*, 650 A.2d 848, 851-53 (Law Div. 1994).  Discretionary judgment calls only reach the level of breach of duty where there is no rational basis for the action.  *See Brown*, 650 A.2d at 852. ("The concept of negligence, however, when dealing with the propriety of discretionary decisions, involves an area in which mistakes are not negligent unless no reasonable person would have made them (i.e., they were unconscionable).").

As noted repeatedly in these findings and conclusions, Karpman knew Timokhine and was generally familiar with his background, and Karpman knew that Timokhine never held himself out to be a lawyer or to have legal training.  *See* Karpman Test., Vol. III, 444:16-23; *see also* Timokhine Test., Vol. I, 176:3-10.  In fact, it is clear to the Court based upon the sum total of the testimony and other evidence before it, that Interlink engaged Defendants for their business acumen and not as legal counselors.

Under this rubric, and assuming *arguendo* a principal agent relationship, the complained of events fall well within the category of discretionary decisions and errors of judgment; they were rational decisions that did not work out as planned, not negligence sufficient to constitute a breach of fiduciary duty.  Acting with reasonable skill and care does not require an individual to expend any and all costs and efforts.  If it did, the Court would be required to find a breach of fiduciary duty whenever a potential business risk befell the venture and Defendants could have hired or consulted someone or otherwise done something extra to prevent the result.  *See* Restatement (Third) § 8.08; *see also Industrial Maritime Carriers v. Thomas Miller Inc.*, No. 06–5625, 2009 WL 5216971, at *8 (D.N.J. Dec. 29, 2009).  Here, Defendants made discretionary decisions on how to best fulfill his duties in the egg shipping business, and to the extent he made any mistakes, they were not unconscionable mistakes.  The fact that Defendants were unsuccessful to the extent desired by Plaintiff and Karpman does not, by itself, make Defendants' efforts a breach of fiduciary duty.  Plaintiff has not provided evidence or facts to demonstrate Defendants' activities were such that no reasonable person of similar skill and function would make them.

Moreover, Karpman appeared to accept Timokhine's performance.  Karpman's testimony indicates that he believed he had significant latitude to change Plaintiff's working relationship with Defendants.  Indeed, Karpman testified that in April 2011, he was dissatisfied with the performance of Timokhine to the point that he sought to reduce Defendants' compensation under the profit-sharing agreement.  Karpman further testified that his reduction of Defendants' compensation was only after the CWT arbitration panel rejected the unlimited duration exclusivity provision in 2009.  The Court notes that Karpman's offer to reduce Defendants' payment came after the initiation of the Florida lawsuit, and well after Timokhine's 2010 email to Morris.  With these events having already taken place, Karpman was still apparently satisfied with Timokhine's performance enough to keep his services at a reduced rate.  It was only Timokhine's dissatisfaction with the pay scale that caused the ultimate death of their business relationship.  The Court would be hesitant to impose a breach of fiduciary duty upon Defendants for performance with which Plaintiff and Karpman appeared at least tacitly satisfied.  *See Fried v. Aftec, Inc.*, 587 A.2d 290, 297 (N.J. Super. Ct. App. Div. 1991) ("An employer cannot give an employee negative fitness reports, retain the employee, and later sue him for failure to perform the agreement or for overall negligence or carelessness, allegedly causing the company financial losses. . . . The employer's remedy is to fire the employee for ineptness or lack of diligence.").

c. *Duty of Loyalty*

In the Court's July 18, 2014 Opinion on Summary Judgment, the Court denied Plaintiff's claims for breach of Defendants' fiduciary duty of loyalty as an improper attempt to amend the Complaint through brief on a motion. *See* Dkt. No. 100, July 18, 2014 Op., at 17. As the Court has already limited the claims to the breach of the duty of care, the Court need not reach Plaintiff's arguments related to Defendants' alleged breach of loyalty.[10]

**F. Breach of Fiduciary Duty by Alexander Karpman (*Third Party Complaint, Count I*)**

Defendants also assert Karpman breached his fiduciary duties through his activities and ultimate failure to pay some of the monies owed to Timokhine as consideration for the NCA or profits earned in the egg shipping and coal ventures. *See* FPO, at ¶¶ 69-94; Dkt. No. 32, Third Party Compl., Count I, ¶¶ 6-42. As the Court has previously discussed, the NCA is a valid contract, and the $780,504.75 constitutes both consideration for the NCA and payment of any monies owed

---

[10] The Court notes, however, that Plaintiff's claim for breach of loyalty would fail in any regard. Notably, Plaintiff has failed to show any injury stemming from Defendants' alleged breach of loyalty. To recover money damages for an employee's breach of the duty of loyalty, the employer must establish that the employee's breach proximately caused the requested damages. *See Cameco Inc. v. Gedicke*, 157 N.J. 504, 518 (1999). Plaintiff has not alleged any harm from Defendants' alleged disloyalty. Plaintiff's claim for breach of loyalty focuses on Timokhine's contract with Keith Smith. Timokhine emailed Keith Smith to inform them he was leaving and to offer his help in the future. At this point, Keith Smith did not have a contract with Interlink. After Timokhine left the egg-shipping business, Timokhine entered into a relationship with Keith Smith, and a contract was signed between White Bird and Keith Smith. That contract never came to fruition, however, and Timokhine withdrew from that relationship. Moreover, Keith Smith and Interlink were simultaneously in discussions to continue their previous egg-shipping business. Indeed, the parties entered into an exclusive relationship in September 2012, which Eddy Slick testified was still in place. Slick Test. Additionally, Plaintiff neither provided proof on the record, nor in its expert report prepared by Udinsky, of any damage calculations based upon Defendants' breach of his duty of loyalty. The report and testimony relate solely to any breach of duty of care by Timokhine.

to Defendants.  Therefore, Defendants cannot establish the required element of injury and this Count fails.

## IV.  CONCLUSION

For all of the foregoing reasons, the Court concludes that the NCA, as modified herein, is a valid and enforceable contract.  The Court finds in favor of the Defendants ATFC and Timokhine on Plaintiff's claims for breach of contract (Plaintiff's Complaint, Count I) and breach of fiduciary duties (Plaintiff's Complaint, Count III).  The Court finds in favor of the Plaintiff Interlink on Defendants' claims for breach of contract (Amended Counterclaim, Counts I, II, and VII), unjust enrichment (Amended Counterclaim, Count III), promissory estoppel (Amended Counterclaim, Counts IV and VIII), declaratory judgment (Amended Counterclaim, Count V), and tortious interference with contractual relations (Amended Counterclaim, Count VI).  The Court finds in favor of Third Party Defendant Karpman on Defendants' claims for breach of fiduciary duty (Third Party Complaint, Count I), fraudulent misrepresentation (Third Party Complaint, Count II), and tortious interference with contractual relations (Third Party Complaint, Count III).  An appropriate Order accompanies these Findings of Fact and Conclusions of Law.

Dated: February 20, 2015


        s/ James B. Clark, III
**JAMES B. CLARK, III**
**United States Magistrate Judge**