NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| INTERLINK GROUP CORP. USA, INC., <br><br>Plaintiff, <br><br>v. <br><br>AMERICAN TRADE AND FINANCIAL CORP., et al., <br><br>Defendants/<br>Third-Party Plaintiffs, <br><br>v. <br><br>ALEXANDER KARPMAN, <br><br>Third-Party Defendant. | Civil Action No. 12-6179 (JBC) <br><br>OPINION AND ORDER |

**CLARK, United States Magistrate Judge**

This matter returns to the Court on remand from the United States Court of Appeals for the Third Circuit. This Court conducted a bench trial in this matter beginning on August 4, 2014, and concluding on August 6, 2014. Following the decision of this Court, Plaintiff Interlink Group Corporation USA, Inc. ("Interlink" or "Plaintiff") filed an appeal with the Third Circuit on February 27, 2015 [Dkt. No. 122], and Defendants American Trade and Financial Corporation ("ATFC") and Anatoli Timokhine (collectively "Defendants") filed a cross appeal on March 10, 2015 [Dkt. No. 124]. The Third Circuit, in an Opinion dated March 22, 2016, affirmed this Court's ruling on Interlink's claims against ATFC and Timokhine and vacated this Court's Order granting judgment against Timokhine and ATFC on their counterclaims and

1

remanded. *See Interlink Grp. Corp. USA v. Am. Trade & Fin. Corp.,* 645 F. App'x 125 (3d Cir. 2016).[1]

## I. BACKGROUND AND PROCEDURAL HISTORY[2]

In 2005, Interlink, through its president Alexander Karpman, partnered with ATFC, through its president Anatoli Timokhine, to export broiler hatching eggs from the United States to Russia and other former Soviet Union Countries. At the beginning of their business relationship, the parties orally agreed to split the profits from the business equally. As part of the business arrangement, each party assumed certain duties. Interlink would purchase eggs from United States suppliers, take custody of the eggs, and then arrange for their overseas transport. As the face of the operation, Interlink was the named party in all contracts. Timokhine assumed the title of Chief Financial Officer, for which he received no additional compensation. Timokhine's duties involved negotiations with suppliers, the drafting of purchasing and exclusivity agreements, the keeping of Interlink's business documents, and the management of Interlink's bookkeeping and finances.

In its contracts with egg suppliers, Interlink used Exclusivity Agreements, which were drafted by Timokhine and reviewed by Karpman. The Exclusivity Agreements were separate documents, signed and executed by the egg suppliers and Interlink, which established an exclusive relationship between the supplier and Interlink as long as Interlink purchased a stated quantity of eggs per year. One of Interlink's suppliers was Morris Hatchery. Interlink and Morris Hatchery entered into an exclusive business relationship, which included an Exclusivity

---

[1] In the interest of consistency, when referring to the Third Circuit's Opinion remanding this matter, the remainder of this Opinion and Order cites to the Docket Entry which contains the Third Circuit's Opinion.
[2] This Opinion includes only the facts relevant to ATFC and Timokhine's counterclaims which were remanded by the Third Circuit. For a full recitation of the background of this matter, including Interlink's claims against ATFC and Timokhine, see the Court's Findings of Facts and Conclusions of Law entered on February 20, 2015 [Dkt. No. 120].

2

Agreement, in January of 2007.[3] On June 28, 2010, Timokhine sent an email to Ed Morris of Morris Hatchery to begin discussions regarding a renewal of Interlink's contract with Morris Hatchery. Although the contract between Interlink and Morris Hatchery included an Exclusivity Agreement with an unlimited duration term, Timokhine, purportedly by mistake, stated in an email that the exclusive contract between Interlink and Morris Hatchery would expire at the end of the year. In late 2010, Morris Hatchery filed for declaratory judgment in the United States District Court for the Southern District of Florida to determine that the Exclusivity Agreement expired at the end of 2010 (the "Florida Action"). Interlink alleged that Morris Hatchery violated the terms of the Exclusivity Agreement and counterclaimed for breach of contract. Timokhine and ATFC were not named as parties in the Florida Action. In May of 2012, the jury in the Florida Action returned a verdict in favor of Interlink on its breach of contract counterclaim and awarded a judgment of $2,066,711.02, which was paid to Interlink.

In April of 2011, during the pendency of the Florida Action, Karpman sought to reduce ATFC and Timokhine's share of profits in the egg shipping business from a 50% per party profit-sharing arrangement to 70% to Interlink and 30% to ATFC and Timokhine. Although under the new arrangement ATFC was to take on an additional share of the office rent and communication expenses, each party would continue to cover their own expenses and their roles in the business would stay the same. According to Karpman, the reduction in ATFC's share of the profits was due to Timokhine's purportedly poor job performance, in particular the problems Interlink had experienced with the Exclusivity Agreements drafted by Timokhine. The new

---

[3] The agreement between Interlink and Morris Hatchery was amended twice after its original negotiation. First, it was amended to expand the territory covered by the exclusivity provision to Ukraine in November of 2007 and second in October of 2008 to reduce the quantity of eggs to be purchased.

profit-sharing arrangement was presented to Timokhine as an ultimatum: either Timokhine would agree to accept a reduced share in the profits or he would leave the business.

According to Karpman, Timokhine accepted the changes to the profit-sharing arrangement over the telephone and continued to work with Interlink in the egg shipping business, which further indicated his acceptance of the new agreement. However, according to Timokhine, the reduced profit share was rejected at the time it was proposed and Timokhine's continued work with Interlink in the egg shipping business was under the original 50/50 split. In late 2011 and early 2012, the relationship between the parties deteriorated further. Timokhine attributed the decline to Karpman's alleged refusal to split the profits 50/50 in accordance with their original agreement. On March 8, 2012, Timokhine sent an email outlining his duties and participation in the business and outlined several options for payments and wrapping up the business. On March 31, 2012, the parties terminated their working relationship and stopped their collective egg shipping business efforts.

At some point between May 2012 and June 2012, Karpman forwarded Timokhine a draft of a Non-Compete Agreement (the "NCA"). Timokhine responded in an email and proposed a final resolution to their business relationship, which would include Timokhine leaving the company as of April 1, 2012, after certain conditions were met, including the proper distribution of profits from 2010, 2011, and the portion of 2012 prior to the dissolution of the egg shipping business, and the payment of 50% of the monies from the Florida Action to Timokhine. Despite stating these conditions, Timokhine signed the NCA on August 3, 2012. The NCA prohibited Timokhine from (1) disclosing any information about their egg export business; (2) seeking employment from or consulting with any Interlink customers or competing businesses; and (3) soliciting business from Interlink customers. The NCA also included a statement that Timokhine

was accepting $780,504.75 "as sufficient and due consideration for the faithful performance of his obligations until this agreement." Dkt. No. 1, Ex. B at ¶ 4.

Interlink filed its Complaint in this action on October 2, 2012, seeking damages for breach of contract and breach of fiduciary duties relating to Timokhine's alleged breach of the NCA. *See* Dkt. No. 1. Defendants filed counterclaims against Interlink for breach of contract, unjust enrichment, promissory estoppel, declaratory judgment, and tortious interference with contractual relations on December 8, 2012. *See* Dkt. No. 18.[4] Defendants' counterclaims arose from Interlink's alleged failure to pay ATFC and Timokhine profits from the egg business and half of the judgment from the Florida Action. This Court conducted a bench trial in this matter beginning on August 4, 2016, and concluding on August 6, 2014. After the bench trial, this Court granted judgment against Interlink on its claims against ATFC and Timokhine for breach of the NCA and breach of fiduciary duty and granted judgment against ATFC and Timokhine on their counterclaims against Interlink for breach of contract, unjust enrichment, and promissory estoppel.

Following the entry of judgment by this Court, Interlink filed an appeal with the Third Circuit on February 27, 2015 [Dkt. No. 122], and Defendants filed a cross appeal on March 10, 2015 [Dkt. No. 124]. In their appeal, Defendants argued that this Court erred in rejecting their counterclaims based on an "unsupported" factual finding that the $780,504.75 set forth in the NCA was consideration not only for the NCA but also for Defendants agreeing to release their claims to any profits still owed to them by Interlink and the 50% of the judgment from the Florida Action to which Defendants claimed entitlement. The Third Circuit affirmed this Court's Order as to Interlink's claims for breach of the NCA and breach of fiduciary duty but vacated as

---

[4] Defendants filed an Amended Counterclaim on September 13, 2013 [Dkt. No. 49].

5

to ATFC and Timokhine's counterclaims and remanded "so that [this] Court can either articulate the legal authority and record evidence supporting its ruling on the consideration issue or resolve the factual disputes underlying the counterclaims and decide them on their merits." Dkt. No. 131-1 at p. 10.

## II. DISCUSSION[5]

In vacating this Court's judgment on Defendants' counterclaims, the Third Circuit found that the NCA was "unambiguously clear that the $780,504.75 was consideration solely for the NCA" and that this Court erred in concluding that the $780,504.75 also constituted consideration for Defendants agreeing to release their claims to any profits still owed to them by Interlink and agreeing to release their claims to one-half of the judgment from the Florida Action to which Defendants claimed entitlement. Dkt. No. 131-1 at p. 9. In light of the Third Circuit's Opinion, and upon review of the parties' testimony and evidence in this matter, the Court concludes that its conflation of the issues concerning consideration for the NCA, the Florida judgment, and the sharing of profits was at best unclear, and at worst erroneous. Accordingly, the Court revises its prior finding that the payment of $780,504.75 constituted consideration for the NCA and for ATFC's and Timokhine's agreeing to release their claims to any unpaid profits owed to them by Interlink and the one-half of the Florida judgment. Instead, the Court explicitly finds that the $780,504.75 was consideration solely for the NCA. Accordingly, in light of this revised finding, the Court must now address Defendants' claims to: (1) a portion of the judgment from the Florida Action; and (2) any additional profits owed to Defendants by Interlink.

---

[5] References to the transcript of the bench trial held in this matter will be referred to as follows: the testimony of Anatoli Timokhine is referenced as "Timokhine Test." and the testimony of Alexander Karpman is referenced as "Karpman Test." There are three transcripts from the trial: (1) Volume I, dated August 4, 2014, Dkt. No. 117 ("Vol. I"); (2) Volume II, dated August 5, 2014, Dkt. No. 118 ("Vol. II"); and (3) Volume III, dated August 6, 2014, Dkt. No. 119 ("Vol. III"). Any specific citations to testimony in the transcript will be designated as follows: "Timokhine Test., Vol. I, Page number:Line number".

6

**A. The Florida Action**

During the trial of this matter, Timokhine and Karpman offered differing testimony regarding whether there existed any agreement between them to split the proceeds of the Florida Action. Timokhine stated that it was his understanding that all expenses associated with the Florida Action and any proceeds received from the Florida Action were to be divided equally between the parties, just as it was his understanding that the parties shared equally the costs and profits from the egg shipping business. Timokhine Test., Vol. II, 193:12-15. Defendants claim that Timokhine, through ATFC, did in fact pay an equal share of the attorney's fees in connection with the Florida Action "solely based upon the agreement that [Defendants] would equally share in any settlement or judgment in Interlink's favor." Dkt. No. 137 at p. 11. Defendants assert that Timokhine's participation in the Florida Action, including his testimony therein, and the payment of his own expenses in connection with his participation further demonstrates his understanding that any proceeds were to be equally split.

As evidence of Karpman's alleged understanding that the costs and proceeds from the Florida Action would indeed be shared equally, Defendants further rely on a document containing Karpman's "hand-written notes" which references a sum classified as "attorney's fees" and then includes a calculation of the equal division of that sum. *See* Timokhine Test, Vol. II, 195-200. These notes, Defendants claim, demonstrate Karpman's understanding that the costs of the Florida Action would be shared equally between the parties, which in turn, Defendants argue, leads to the conclusion that the parties also intended to share equally in any proceeds from the Florida Action. Dkt. No. 137 at p. 12. In addition, Defendants cite to the fact that Interlink's

attorney continued to include Timokhine in correspondence related to the Florida Action even after the dissolution of the egg shipping business.

In contrast to Timokhine's assertions as to the existence of an agreement to share equally in the judgment from the Florida Action, Plaintiff asserts that "the record evidence is void of any promises, agreements, or assent to divide the Florida [Action] proceeds in any fashion" which was verified by Karpman's trial testimony. Dkt. No. 136 at p. 15. The Court agrees. First, the Court addresses Defendants' assertion that their payment of half of the attorney's fees in connection with the Florida Action demonstrates the existence of an agreement to share the proceeds. While the payment of half of the attorney's fees in the Florida Action would demonstrate, at least from Timokhine's perspective, an agreement to share the judgment, the record of this case, including Timokhine's trial testimony, does not show that half of the attorney's fees were in fact paid by Defendants.

According to the parties, there were two invoices sent to both Timokhine and Karpman for attorney's fees in the Florida Action. The first invoice for $12,596.01 was sent to the parties on April 23, 2012. Timokhine Test., Vol. 2, 205-207; Karpman Test., Vol. III, 413-414. Both Plaintiff and Defendants agree that half of the amount of the invoice, $6,298.00 was paid by Defendants in the form of a check dated April 28, 2012. Timokhine Test., Vol. II, 206-207; Karpman Test., Vol. III, 414. However, Karpman claimed that he was not aware that Defendants were paying half of the amount of the invoice and that when he discovered Defendants' payment, he issued a check to Defendants to reimburse them for the payment. Karpman Test., Vol. III, 414: 2-9. The second invoice for $40,000 was sent to the parties in May of 2012. Upon receiving the invoice, Timokhine sent a check to Interlink's attorney in the amount of $20,000.00. After the check was not deposited, Timokhine contacted Interlink's attorney who informed Timokhine

that the total amount of the invoice had been paid by Interlink and therefore Timokhine's check would not be deposited. Timokhine Test., Vol. II, 214: 9-21. Based on the evidence submitted by the parties and their testimony at trial, it does not appear to the Court that Defendants paid any of the attorney's fees in connection with the Florida Action.

The Court is likewise unconvinced that Timokhine's payment of his own expenses and his inclusion in correspondence from Interlink's attorney in connection with his participation in the Florida Action as a testifying witness evidences any agreement between the parties to share in the judgment of the Florida Action. While Defendants may have been operating under the impression that the proceeds were to be divided when Timokhine paid his expenses to travel to Florida, Defendants have failed to set forth any documentation or testimony which demonstrates a mutual understanding or agreement by Plaintiff. As to the inclusion of Timokhine in correspondence from Interlink's attorneys relating to the Florida Action, Karpman testified that such an inclusion did not represent any understanding between the parties to share in any judgment, but rather occurred because including Timokhine in correspondence related to Interlink "was a usual order of things" which Interlink's attorney continued even after the parties ended their business relationship. Karpman Test., Vol. III, 494: 10-11. Finally, as to Karpman's hand-written notes, the Court declines to find that this document, which it seems was neither meant to constitute any sort of official business document nor meant to be utilized outside of Karpman's private notetaking, establishes any agreement between the parties to share in the judgment from the Florida Action.

In light of the foregoing, the Court finds that Defendants have failed to demonstrate the existence of any agreement between the parties to share, equally or otherwise, in the judgment

from the Florida Action and therefore Defendants are not entitled to any of the proceeds therefrom.

### B. Shared Profits

The only remaining issue requiring resolution by the Court concerns Defendants' possible entitlement to a portion of the additional profits from 2011 and the period of 2012 prior to the termination of the parties' business relationship. The parties agree that sometime in early 2012 Defendants were paid $275,000.00 by Interlink for shared profits from their joint venture. However, the parties disagree as to whether that amount represented payment to Defendants of all outstanding profits to which they were entitled or a partial payment of Defendants' share of the profits. In addition, the parties disagree as to whether Defendants' profit share should be calculated using a 50/50 split or a 70/30 split. Plaintiff asserts that the $275,000.00 constituted full payment to Defendants for any outstanding share in the profits from the egg shipping business while Defendants claim that even if the Court finds that the profits were to be split 70/30 as asserted by Plaintiff, they are entitled to additional payment for shared profits from 2011 through the dissolution of the parties' business relationship in 2012. Upon review of the record, the Court has determined that there is insufficient evidence to make a final determination as to whether Defendants are entitled to any additional payment for shared profits from the egg shipping business, and if so, what amount Defendants are owed. Accordingly, the Court will conduct a hearing during which the parties will offer testimony regarding this issue to allow the Court to make a final determination.[6]

---

[6] It should be noted that the reopening of a trial in cases where the trial record appears less than complete is perfectly appropriate and within the sound discretion of the trial court. *See Johnson v. Hix Wrecker Service, Inc*., 528 Fed. Appx. 636 (7th Cir. 2013) (citing *Zenith Radio Corp. v. Hazeltine Research, Inc*., 401 U.S. 321, 331-32 (1971); Fed. R. Civ. P. 59(a)(2); *Nanda v. Ford Motor Co*., 509 F.2d 213, 223 (7th Cir. 1974); *Oak Hall Cap & Gown Co. v. Old Dominion Freight Line, Inc.,* 899 F.2d 291, 295 (4th Cir. 1990)).

**III.     CONCLUSION AND ORDER**

The Court having considered the papers submitted pursuant to Fed. R. Civ. P. 78, and for the reasons set forth above;

**IT IS** on this 12th day of April, 2017,

**ORDERED** that the parties shall appear before the Honorable James B. Clark, III, U.S.M.J., Courtroom 8, 2 Federal Square, Newark, New Jersey 07102, on **May 9, 2017 at 10:00 AM**; and it is further

**ORDERED** that the Court will conduct a telephone conference with the parties to discuss the specifics of the above hearing on **April 28, 2017 at 11:30 AM**. Counsel for Plaintiff shall initiate the call.

s/ James B. Clark, III
**JAMES B. CLARK, III**
**United States Magistrate Judge**